RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0030P (6th Cir.)
File Name: 04a0030p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

PAULA MCFARLAND,
  *Petitioner-Appellee,*

  *v.*                              No. 01-1360

JOAN YUKINS,
  *Respondent-Appellant.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 98-70465—Victoria A. Roberts, District Judge.

Argued: September 19, 2002

Decided and Filed: January 23, 2004

Before: DAUGHTREY, GILMAN, and GIBSON, Circuit
Judges.[*]

———————

### COUNSEL

**ARGUED:** Jeffrey W. Caminsky, COUNTY OF WAYNE
PROSECUTOR'S OFFICE, Detroit, Michigan, for Appellant.

———————

[*] The Honorable John R. Gibson, Circuit Judge of the United States
Court of Appeals for the Eighth Circuit, sitting by designation.

James Krogsrud, Detroit, Michigan, for Appellee.
**ON BRIEF:** Jeffrey W. Caminsky, COUNTY OF WAYNE
PROSECUTOR'S OFFICE, Detroit, Michigan, for Appellant.
James Krogsrud, Detroit, Michigan, for Appellee.

———————

### OPINION

———————

JOHN R. GIBSON, Circuit Judge. The district court[1]
granted Paula McFarland a conditional writ of habeas corpus
on the ground that the attorney defending McFarland against
drug charges labored under a conflict of interest because he
also represented her daughter on the same charges. The
Warden appeals the grant of the writ, arguing that McFarland
did not justify her failure to raise the conflict of interest
argument on appeal from the conviction, that the defense
attorney's representation of McFarland and her daughter did
not violate McFarland's Sixth Amendment right to counsel,
and that McFarland received an evidentiary hearing to which
she was not entitled. We affirm the grant of the conditional
writ.

McFarland was charged in Michigan state court with eleven
counts of possession or possession with intent to deliver
various drugs, based on the results of a search on
November 4, 1986, of the house at 15151 Minock in Detroit,
where McFarland and her daughter lived. In a locked
bedroom in the southeast corner of the second floor of the
house, police found the chief incriminating evidence: an
assortment of pills and powders, blank physician's
prescription pads, and physician's ink stamps. Some of the
pills were found in a closet in the southeast bedroom, which
also contained women's clothes; some pills and the

———————

[1] The Honorable Victoria A. Roberts, United States District Judge for
the Eastern District of Michigan.

prescription paraphernalia were found in a file cabinet in the room; and some pills and packets of powder were found in a safe in the room. At unspecified locations in the house, police also found two scales; a sifter that was of the type used in the cocaine trade and that had residue on it; a prescription slip for Tylenol 3 made out to Paula McFarland; and tally sheets containing prices, names, addresses and phone numbers. They also found $1423 in cash and three guns, including a homemade .22 caliber made from a pen.

There were four people who could have been linked to the drugs found in the southeast bedroom. First, the only person who was actually in the house at the time of the search was a man, identified as Robert Eaton, who had a key to the front door, but no key to the locked southeast bedroom.

Second, a man was described in the affidavit supporting the search warrant as "black male, unknown, Gheri curl, dark complexion." (Eaton did not match this description.) This man was seen on the stoop of the house when police were investigating complaints received from the "Crack Hotline" about the house at 15151 Minock. The man's identity was not established during trial. However, during the search of the locked, southeast bedroom, police found a marriage license for Donna Ann Reeves and Reginald Leonard Rayford. They also found a briefcase in the house containing documents belonging to Reginald Rayford and two letters addressed to him at 15151 Minock.

Third, McFarland's daughter Donna Reeves lived in the house. Agent Michael Hawes indicated at Reeves's trial that the southeast bedroom was Reeves's bedroom. During the investigation that led to the search, an informant had gone to the house attempting to buy drugs; the informant reported speaking to "Donna," who said that she had dilaudids, but that she would not sell them without seeing a "known face." Police found documents stored in the dresser in the southeast bedroom, many of which bore Reeves's name, such as the marriage license for Reeves and Rayford, a number of

receipts for money orders bearing Reeves's name and the 15151 Minock address, and a receipt from the Humane Society made out to "Donna Rayford." There were women's clothes in the closet of the southeast bedroom, but there is no evidence as to what woman they belonged to.

Fourth was petitioner, Paula McFarland. McFarland's name appeared on many of the documents found in the dresser in the southeast bedroom, such as money order receipts and a notice from the Michigan Department of Social Services. Her name also appeared on a prescription for Tylenol 3 found somewhere in the house.

McFarland and her daughter hired one lawyer, Leroy Daggs. At the preliminary hearing in May 1987, counselor Daggs informed the court that he was representing both McFarland and Reeves, that he had held discussions with both of them about the possibility of conflict of interest, and that they did not anticipate a conflict arising. The court informed each defendant individually of her right to have separate counsel appointed, and both defendants stated that they wished to proceed with Daggs representing them jointly.

On April 5, 1988, the day trial was to begin, the court again inquired on the record whether there was any conflict of interest due to Daggs's joint representation of McFarland and Reeves. Daggs replied first:

I know at the examination I did [represent both defendants], and I realize now this is probably a little more–as far as representation is concerned, it would be–if I were going to make opening statements, I know I would have to make two or–in closing statements, if I were, I would have to make two. But I think maybe in talking with them this morning, I don't think that they feel very comfortable about the fact that–they've been talking to outsiders who indicate that I could represent both of them at trial.

The court probed: "Are you presenting some defenses here that may be antagonistic in some kind of way?" Daggs answered:

> See, there were different–I think when the officers testified, there were different places in the house that certain things were found. Whether or not there is a possibility during the course of this trial, if there was–if those antagonistic defenses as to both of them would occur–I don't know.
>
> As I said, I've never been in this situation before, your Honor, where I've had two people at trial time, and I know that sometimes things can become sticky maybe. Maybe I would object, maybe the other attorney, if he represented the other party, maybe would not or maybe he would and I would not.
>
> I think maybe I could handle it, but again after talking with them this morning, and the other day by telephone–this morning out in the hall–they have begun to raise some problems, your Honor. I think maybe the Court should more interrogate them as to the particular issue.

The court commented:

> Well, I'm not concerned about any kind of problem that the defendants are being raised here, you know, in terms of what–if there's some kind of dissatisfaction. I'm just concerned about following the procedure on this, and so far I haven't heard anything that seems to be possibly antagonistic defenses here.

Despite its impression that Daggs had not established a conflict, the court inquired of Reeves:

> Do you see that there is–that you are raising some issues or defenses that may be in a sense antagonistic to those that are raised by Ms. McFarland, or are you aware of what that might be in any way?

> In other words, are you–is a part of your defense in this case, you know, that things that might have been found didn't belong to you; they might have belonged to someone else?
>
> Defendant Reeves: Yes.
>
> ....
>
> The Court: Okay. And let me understand here what it is that you are saying, okay? Do you see any problem with Mr. Daggs representing both you and Ms. McFarland? And if so, what do you think those problems are?
>
> Defendant Reeves: I think I need another lawyer. He's good, but I don't think he can handle both of us.
>
> The Court: Why do you think that; that's what I'm asking.
>
> ....
>
> Defendant Reeves: Because I've talked with different people, and they just said I need a different lawyer.

The court then questioned McFarland:

> Without–I'm not asking you to make any kind of a statement or admissions or anything like that, but do you perceive it as part of your defense that it maybe antagonistic in some way to the defense of Ms. Reeves? Do you understand what I'm saying?
>
> Defendant McFarland: You Honor, I had called another attorney.
>
> The Court: Pardon me?
>
> Defendant McFarland: I had called another attorney, and he was too expensive, okay, to represent me, because I feel like it may come to a point where we do need two attorneys, and that he was too expensive, so I just had to leave that alone. But I feel that maybe it's best that we do need two.
>
> I mean I have no doubt that Mr. Daggs is not a good attorney, but I think that probably, you know, we need one each.

The court expressed its concern that the defendants had taken no action to ask for appointment of counsel until the day of trial. As the defendants were prepared to waive their rights to a jury trial, the court determined that the proper course was to sever the cases, but proceed to trial with Daggs representing each defendant in front of different judges.

### The Trials

The government's evidence at the respective trials of Reeves and McFarland differed. At Reeves's trial, the government introduced the documents that tended to link Reeves to the southeast bedroom, and at McFarland's trial, it introduced documents linking McFarland to the room. At Reeves's trial, Officer Dennis Baaki testified about searching the southeast bedroom, and he identified Reeves's and Rayford's marriage license; money orders signed variously by Reeves, McFarland and a Brenda Retmer; the Humane Society receipt made out to "Donna Rayford"; a money order from an insurance company to Reeves; and a "document from the State of Michigan"–all of which were found on the dresser in the southeast bedroom. Also at Reeves's trial, Agent Hawes testified that police had received Crack Hotline telephone complaints about a "Donna." Hawes also referred to the southeast bedroom as Reeves's room and the second bedroom as McFarland's. Daggs argued in Reeves's case, "[M]ost of these narcotics were taken out of one room and not out of the other room . . . [N]o one knows exactly which room Donna Reeves was in because, if it were shown, I mean only by mail and letters but other things. . . ." Daggs argued that the narcotics could have belonged to Eaton or the other man who was not at the house at the time of the search. The judge trying Reeves found that Eaton did not have a key to the southeast bedroom and that Reeves was linked to the bedroom by the documents found there that bore her name. The judge specifically noted that possession did not have to be exclusive, but could be joint. The judge found that the evidence that Reeves had possession and control of the

southeast bedroom was sufficient to establish a possessory interest in the drugs. Accordingly, he found Reeves guilty.

At McFarland's trial, in contrast to Reeves's, when Baaki testified about the documents found in the southeast bedroom, he identified a notice addressed to McFarland at 15151 Minock, a receipt signed by McFarland, and 26 receipts for money orders, of which 23 bore McFarland's name and three bore the name "Brenda something." He identified *no* documents bearing Reeves's name or Reeves's putative husband's name, nor did Daggs ask him about any such documents on cross examination. Officer Deborah Steward identified a prescription slip for Tylenol 3 in the name of Paula McFarland, but she did not say where the slip was found. Officer Steward testified that $1423 in cash was found in the "far bedroom, not the south east bedroom." Steward stated that the pen gun was found in the southeast bedroom. When Steward was describing the investigation that led to the issuance of the search warrant, she did not mention the fact that the crack hotline telephone complaints named "Donna" or that the confidential informant had talked to Donna and Donna had said she had dilaudids. Daggs did not bring out these facts on cross examination. Agent Michael Hawes testified that in the second bedroom, which he searched, a purse was found with the pen gun inside and also with a letter or card addressed to Paula McFarland. However, in contrast to his testimony at Reeves's trial, Hawes did not describe the southeast bedroom as Reeves's and the second bedroom as McFarland's. Hawes did describe the telephone complaints as having identified "Donna, no last name, as being the person who was dealing out of the premises." Daggs did not present any witnesses for McFarland's case.

At McFarland's trial, Daggs's summation developed the theory that the narcotics could have belonged to one of the two men, Robert Eaton or Reginald Rayford, but Daggs never mentioned the evidence that the locked, southeast bedroom was Reeves's room. To the contrary, he appeared to concede that it was McFarland's room:

So, and we–I'm assuming if we had two men living there at the same time we had two women they were probably maybe sharing bedrooms so how can we say that Paula McFarland would be guilty of possession and control of narcotics and not the person maybe who was sharing the bedroom with her. That person could have just as easily brought those pills in there. The same with Donna Reeves. Evidently they indicated somewhere in here, well, maybe that was in the other case. I'm getting confused, that they introduced a marriage license of–I don't think it was in this case, I'm not sure but there was a marriage license showing Donna Reeves was married to this man Mr. Rayford . . . .

When Daggs touched on the investigation leading to the issuance of the warrant, Daggs not only failed to point out that it was Donna Reeves, not McFarland, who engaged in the conversation about dilaudids with the informant, but he actually gave the impression that it was McFarland:

Now they couldn't–they weren't successful making any buys. They says some white lady came to the door, well so what? . . . But there wasn't any buy made. So how can you associate either–I mean Miss Paula McFarland with anything. I mean they haven't, all they have is her name on something that she lives there. Well, we don't deny that. But if she's to be charged with this and the other people who lived there, the two black males, they weren't charged.

In his summation, the prosecutor reviewed the documentary evidence with McFarland's name on it found in the southeast bedroom. He said, "So it's pretty clear to me from that evidence that the *occupants of that bedroom* were involved in the narcotic trade and it's pretty clear Mr. Eaton was excluded from that [because he had no key to the southeast bedroom]." (Emphasis added.) The trial court interrupted:

You–you would like the Court to conclude from all of the evidence, including the fact that the pen gun was found in this defendant's purse, that she was involved or had constructive possession. I'm going to go back over the evidence as I recall it, but my recollection is that the pen gun was found in a purse in a different bedroom from where the drugs were found?
The prosecutor: I think that's accurate.
The Court: And also that the drugs were found in a bedroom where there were was [sic] women's clothing and two women living in the house?
The prosecutor: *There's been no direct testimony that Donna Reeves lived there.*
The Court: Okay.
....
The Court: And there was no evidence about what else was found in the bedroom where the purse was found?
The prosecutor: Correct.

(Emphasis added.)

Later, on April 21, when the trial judge made her findings, she had apparently forgotten that McFarland's purse was found by Agent Hawes in the second bedroom; instead, she relied on the testimony of Officer Deborah Steward, whose role was not to search the house, but to catalog the evidence found by the searchers: "[Officer Steward] placed on her return a home made .22 caliber pen gun found from the purse taken from the south east bedroom." The trial judge later made a contradictory finding that Agent Michael Hawes found the pen gun "in a purse in the upstairs bedroom at the end of the hall, and there was a letter in that purse and that letter was addressed to Paula McFarland." The judge found McFarland guilty, but she remarked:

The only thing that I–I have to tell you this, Mr. Daggs, in all honesty. I thought about it, I almost was ready to find not guilty because I did not think at first blemish

that if you had two women living in the house you can narrow it down but --
Mr. Daggs:  That's my thought too.
The Court:  I went back over the evidence and I was convinced beyond a reasonable doubt.

McFarland was convicted on ten of the eleven counts and sentenced to various concurrent terms, including twenty to thirty years for possession with intent to deliver 225-650 grams of Oxycodone.

### Appeals and State Post-Conviction Proceedings

McFarland and Reeves both appealed to the Michigan Court of Appeals, and both were represented by Attorney Robert F. Mitchell.  Mitchell raised seven points on appeal, including a challenge to the sufficiency of the evidence, a challenge to the sufficiency of the affidavit supporting the search warrant, and an argument that amendments to the Michigan Controlled Substance Act should apply retroactively to McFarland's case. Counsel did not argue that McFarland had received ineffective assistance of counsel, nor did he mention the possibility of a conflict of interest.  The Michigan Court of Appeals consolidated Reeves's and McFarland's cases and affirmed the convictions, but remanded for resentencing under the amendments to the Controlled Substance Act.  On remand, McFarland's sentence was reduced from twenty to thirty years to ten to thirty years. The Michigan Supreme Court denied leave to appeal.

McFarland then filed a motion for postconviction relief in the Michigan courts, raising the ineffective assistance of trial counsel and of appellate counsel for failing to argue that trial counsel was ineffective.[2]   The motion was denied, as was

---

[2]The record before us does not contain the postconviction motion itself, but the district court found that the motion attempted to develop the facts material to the ineffective assistance of counsel claims, and the Warden's counsel conceded at a hearing before the district court that

leave to appeal to the Michigan Court of Appeals and Michigan Supreme Court, *People v. McFarland*, 573 N.W.2d 617 (Mich. 1997), on the ground that the claim for relief could have been raised on appeal and McFarland did not show good cause for her failure to do so.   Michigan Criminal Rule 6.508(D) forecloses review of claims a defendant could have, but did not, raise on appeal, unless the defendant shows cause and prejudice for the default.

### Habeas Proceedings

McFarland filed this federal habeas corpus proceeding in 1998, arguing (among other things) that she was entitled to relief because the trial court failed to inquire into the possibility of a conflict of interest resulting from trial counsel's joint representation of Reeves and McFarland; that trial counsel's conflict of interest adversely affected his representation of McFarland; that trial counsel's deficient performance affected the outcome of her trial; and that appellate counsel was ineffective in failing to raise trial counsel's deficiencies in McFarland's direct appeal.   The Warden raised the defense that McFarland's procedural default in failing to raise ineffectiveness of trial counsel on her direct appeal was an independent and adequate state ground supporting the state courts' denial of postconviction relief.

The district court held that "M[ichigan] C[riminal] R[ule] 6.508(D)(3) is not an independent and adequate state rule." Order of May 11, 1999, slip op. at 10.  Therefore, the district court held that McFarland's failure to raise the ineffective

---

McFarland had attempted to raise the issue.  Transcript of Hearing of February 15, 2001 at 11, 18.  Moreover, McFarland's Application for Leave to Appeal the denial of the postconviction motion shows that McFarland raised the ineffective assistance of trial counsel, that she offered the ineffectiveness of appellate counsel as cause for her failure to raise the argument about trial counsel, and that she sought an evidentiary hearing.

assistance of trial counsel on direct appeal presented no procedural obstacle to reaching the merits on habeas. *Id.* at 11. On the merits, the district court first held that a defendant is entitled to relief without proof of prejudice whenever a trial court "is or should be aware of a potential conflict" of interest and the court nevertheless fails to take adequate steps to ascertain whether separate counsel are needed. *Id.* at 12. The court held that McFarland was entitled to relief according to this principle because she objected before trial to having to share counsel with Reeves and because the trial court should have known a serious conflict existed after Daggs explained that the question at trial would be who had possession of drugs found in different parts of the house. *Id.* at 13. The district court held that the trial court's failure to investigate the conflict and assure that McFarland received assistance of a lawyer entirely loyal to her violated McFarland's Sixth Amendment rights. *Id.* at 13-14. Alternatively, even without the rule granting relief without a showing of prejudice, the district court held that McFarland was entitled to relief because her counsel labored under an actual conflict of interest adversely affecting his performance. *Id.* at 16. The court found that Daggs's decision to present a common defense seeking to exonerate both Reeves and McFarland made no strategic sense at all, since Reeves and McFarland were tried separately. Furthermore, the court found that Daggs's failure to introduce any evidence pointing to Reeves's possession of the drugs, even the mere fact that Reeves lived in the house, showed that his representation of McFarland was adversely affected by his loyalty to Reeves. *Id.* at 17. The court therefore granted McFarland the writ conditionally, allowing the state the option of affording her a new trial within ninety days of the decision. *Id.* at 19.

We reversed because the district court's procedural ruling was incorrect. *McFarland v. Yukins*, No. 99-1659, 2000 WL 1290125 (6th Cir. Sept. 5, 2000) (unpublished). We determined that the procedural default cited by Michigan courts was an independent and adequate state ground, so it would be necessary for the district court to ascertain whether

McFarland had shown cause and prejudice excusing her failure to raise the conflict of interest argument on appeal from the conviction. *Id.* at *3.

The cause and prejudice McFarland offered to excuse her default was ineffective assistance of *appellate* counsel in failing to argue the ineffective assistance of *trial* counsel. Her claim of ineffectiveness of appellate counsel rested on two theories: first, appellate counsel had also labored under a conflict of interest because he represented both McFarland and Reeves, and second, appellate counsel had simply failed to raise her strongest argument, which showed that he made an unreasonable error and that the error caused her to lose her appeal.

The district court held an evidentiary hearing at which McFarland called appellate counsel, who testified to almost nothing of usefulness to either side because he had relinquished his files to Reeves and he had no independent recollection of what he had done in the case or why he had done it.

Nevertheless, the district court found that appellate counsel's assistance had indeed been ineffective because he had unreasonably failed to raise the trial counsel's conflict of interest and, had he done so, McFarland would have won her appeal. Order of February 22, 2001, slip op. at 11-12. Therefore, the district court held that McFarland's failure to raise the issue on appeal had been excused and the court was authorized to reach the merits, as it had done in its first order granting the writ. The court reaffirmed its earlier order granting McFarland a conditional writ of habeas corpus. *Id.* at 13.

On appeal, the Warden argues that McFarland should not have been allowed to have the evidentiary hearing at which she tried to prove that her appellate counsel's ineffectiveness caused her to default her claim of trial counsel's ineffectiveness. The Warden also argues that the appellate

counsel's representation of McFarland was not ineffective because even if counsel had raised her claim about her trial counsel, McFarland would not have won her appeal on that claim. Finally, the Warden argues that the trial counsel's representation was not affected by an actual conflict of interest and that the trial court had no obligation to do anything more than it did to safeguard McFarland's right to effective counsel.

## I.

We review the district court's legal conclusions de novo and its factual findings for clear error. *Lucas v. O'Dea*, 179 F.3d 412, 416 (6th Cir. 1999). McFarland's ineffective assistance of counsel claim presents a mixed question of fact and law, which is therefore subject to de novo review. *Id.* The district court's determinations of questions of procedural default and cause and prejudice are also subject to de novo review. *Id.*

Logically, we must decide the procedural question of whether McFarland is entitled to pursue her claim of ineffective assistance of trial counsel before we reach the merits of that claim. However, the nature of the procedural arguments in this case requires us to decide at the outset whether that underlying claim has merit, as we will explain.

The Warden argues that McFarland is not entitled to raise trial counsel's effectiveness on federal habeas because she neglected to raise the claim on her direct appeal, as required by state procedural rules. McFarland's answer to the Warden's procedural defense is that her claim of trial counsel's ineffectiveness was so strong that her appellate counsel's failure to raise it shows she also received ineffective assistance of counsel on her state appeal. Ineffective assistance of counsel can supply the cause that, together with prejudice, would excuse a procedural default. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). In order to show ineffective assistance of counsel excusing a procedural default, it is first necessary to establish that the defendant had

a constitutional right to counsel at the procedural stage at which the alleged attorney error occurred. *Coleman v. Thompson*, 501 U.S. 722, 752 (1991). The failure to raise ineffectiveness of trial counsel occurred on McFarland's first appeal of right, at which stage she enjoyed a constitutional right to counsel. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985).

McFarland must show that her appellate counsel's failure to raise the ineffectiveness of trial counsel rose to the level of a constitutional violation under *Strickland v. Washington*, 466 U.S. 668 (1984). According to *Strickland*, a defendant's Sixth Amendment rights are violated if (1) the defendant's attorney commits an error "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," *id.* at 687, and (2) counsel's deficiency so prejudiced the defense that there is a reasonable probability that, but for counsel's performance, the result of the proceeding would have been different, *id.* at 694. Counsel's failure to raise an issue on appeal could only be ineffective assistance if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal. *See Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001), *cert. denied*, 535 U.S. 940 (2002). Thus, in order to decide whether McFarland can present her claim of ineffective assistance of trial counsel, we have to decide whether there is a reasonable probability that the claim would have prevailed at the time counsel failed to raise it. *Cf. Lucas*, 179 F.3d at 420 (counsel could be ineffective for failing to raise argument that would have been overruled at the time it was omitted, if a change in law was foreshadowed). We consider this question in section II, *infra*.

If there is a reasonable probability that McFarland would have prevailed on appeal had the claim been raised, we can then consider whether the claim's merit was so compelling that appellate counsel's failure to raise it amounted to ineffective assistance of appellate counsel that would excuse McFarland's procedural default. *See* Section III, *infra*. Along the way, we must decide whether the district court erred in

allowing McFarland the evidentiary hearing at which appellate counsel was questioned about how he selected the issues to be raised on appeal. *See* Section IV, *infra*.

If ineffective assistance of appellate counsel excused the failure to raise ineffectiveness of trial counsel on appeal and if trial counsel was constitutionally ineffective, our inquiry is still not concluded. Because McFarland's habeas claim is governed by the Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, Tit. I, § 104, 110 Stat. 1218 (1996), known as the AEDPA, if her claim of ineffective assistance of trial counsel was adjudicated on the merits in state court, she can only receive federal habeas relief if the state adjudication of her claim was contrary to or involved an unreasonable application of clearly established federal law embodied in decisions of the Supreme Court or else the state adjudication involved an unreasonable determination of the facts. 28 U.S.C. § 2254(d) (2000). We consider the application of the AEDPA standard to McFarland's case in Section V, *infra*.

## II.

The Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." At the time of McFarland's appeal from her conviction in 1988-89, there were three possible routes to establishing that her trial counsel provided ineffective assistance violating her Sixth Amendment right to counsel. To determine whether appellate counsel's assistance was ineffective, we must first ascertain whether there is a reasonable probability that McFarland would have won her appeal on any of these three theories.

## A.

Under the rule of *Holloway v. Arkansas*, 435 U.S. 475 (1978), when a defendant or his counsel voices a timely objection to joint representation of clients with antagonistic interests and the trial court fails to investigate the conflict, a defendant is entitled to automatic reversal without demonstration of prejudice. *Harris v. Carter*, 337 F.3d 758, 761 (6th Cir. 2003). The reason for this automatic reversal rule is that "[j]oint representation of conflicting interests is suspect because of what it tends to prevent the attorney from doing." *Holloway*, 435 U.S. at 489-90. The record will ordinarily not memorialize mistakes of omission as it does affirmative instances of trial error, *id.* at 490-91, so for courts to evaluate the existence and effect of such omissions would entail "unguided speculation." *Id.* at 491. Moreover, "counsel's conflicting obligations to multiple defendants 'effectively sea[l] his lips on crucial matters,'" thus preventing counsel from making an adequate record to establish prejudice. *Mickens v. Taylor*, 535 U.S. 162, 168 (2002) (quoting *Holloway*, 435 U.S. at 489-90). Although this evidentiary concern exists whenever counsel is subject to divided loyalty, the *Holloway* automatic-reversal rule does not apply to every such case; instead, it is limited to situations where "defense counsel is forced to represent codefendants over his timely objection, unless the trial court has determined that there is no conflict." *Mickens*, 535 U.S. at 168. Sometimes defendants prefer joint representation, even if there is the possibility of a conflict. *See Wheat v. United States*, 486 U.S. 153, 159 (1988); *Serra v. Mich. Dept. of Corrections*, 4 F.3d 1348, 1350-54 (6th Cir. 1993). Limiting the *Holloway* automatic-reversal rule to cases in which a defendant has timely objected to the conflict recognizes that defendants have a countervailing interest in being allowed to proceed with counsel of their own choice, while also ensuring that the defendant cannot have it both ways by asking for reversal or habeas corpus on the basis of representation that he or she acceded to during trial. *See Smith v. Anderson*, 689 F.2d 59, 64-65 (6th Cir. 1982) ("Because certain benefits of a single defense counsel may be imagined, a different and more searching review [than that prescribed in *Holloway*] is mandated when the defense is silent until the appropriate occasions for objecting have passed." (citations omitted)).

McFarland's case presented the factors that make it obligatory under *Holloway* for the trial court to investigate. First, Daggs's representation of Reeves and McFarland was the kind of joint representation covered by the *Holloway* rule. We have distinguished among the different situations in which a lawyer's representation of various clients compromises his duty of loyalty:  "joint and dual representation refer to simultaneous representation occurring in the same proceeding, while multiple representation refers to simultaneous representation in separate proceedings." *United States v. Moss*, 323 F.3d 445, 456 n.15 (6th Cir.), *cert. denied*, 124 S. Ct. 303 (2003).[3] "Successive representation occurs where defense counsel has previously represented a co-defendant or trial witness." *Id.* at 459.  In *Mickens*, the Supreme Court recently noted it has never applied the heightened protections from its conflict of interest jurisprudence to cases of successive representation. 535 U.S. at 176 (discussed in *Smith v. Hofbauer*, 312 F.3d 809, 816 (6th Cir. 2002), *cert. denied*, 124 S. Ct. 441 (2003)).

This court recently affirmed the grant of habeas under the *Holloway* rule in *Harris v. Carter*, 337 F.3d 758 (6th Cir. 2003), a case in which one lawyer, Evans, represented both the petitioner, Harris, and a co-defendant, Payton, who was called as a witness and incriminated Harris at trial. Harris's and Payton's cases were originally joined for trial, but the trial court severed them, sua sponte, on the day of trial. Payton had already been convicted, but not sentenced, when Harris's trial began. *Id.* at 759. When Evans learned that Payton would be called to testify at Harris's trial, he asked that Payton be appointed separate counsel. *Id.* at 759-60. The trial court denied the request and forced counsel to proceed. The state courts held that "*Holloway* was inapplicable to [Harris's] case because Harris and Payton were not tried jointly and . . . because Harris and Payton's separate trials minimized the risk of conflict and Payton had little need for Evans' continued representation." *Id.* at 763. We disagreed. We held that the state decision condoning the joint representation over the petitioner's objection without inquiry by the trial court was contrary to *Holloway*, even though the lawyer's two clients were not tried together. *Id.* at 764.

At the time the trial court ruled on the *Holloway* issue, Daggs was representing two co-defendants joined for trial. This is the prototypic *Holloway* situation and so passes the threshold of eligibility for the *Holloway* rule. Whether the severance on the day of trial fulfilled the trial court's obligation under *Holloway* is discussed below.

---

[3] At this stage in our analysis, we examine the merits of the ineffectiveness-of-trial-counsel-issue only to decide if appellate counsel ought to have raised that issue on direct appeal. We recognize that new law made in cases decided after the 1988-89 period during which McFarland's appeal was pending is not relevant to the question of whether McFarland's appellate counsel should have made a certain argument in her appeal in 1988-89. *But see Lucas v. O'Dea*, 179 F.3d 412, 420 (6th Cir. 1999) (taking into account future developments that were foreshadowed at time of representation). We cite later-decided cases only for their assistance in analyzing the law as it existed in 1988-89.

Second, McFarland voiced an objection[4] to having to share an attorney with Reeves. In *Mickens*, the Supreme Court interpreted *Holloway* as applying only where there has been a timely objection to conflicting representation. 535 U.S. at 168. In this case, Daggs initially informed the trial court that his clients were uncomfortable with him representing both of them at trial. The court asked whether there would be antagonistic defenses. Daggs's response was equivocal, but he did point, albeit cryptically, to the issue of who possessed the drugs based on the location of the drugs in the house: "See, there were different–I think when the officers testified, there were different places in the house that certain things were found. Whether or not there is a possibility during the course of this trial, if there was–if those antagonistic defenses as to both of them would occur–I don't know."

After hearing from Daggs, the court inquired of Reeves and McFarland individually whether they thought there was a conflict. Both stated that they wanted separate lawyers. Moreover, McFarland stated that she had tried to hire separate counsel and could not afford to do so. Reeves confirmed that

---

[4]This Circuit has interpreted *Holloway* to apply when "a defendant *or* defense counsel makes a timely objection to joint representation based on an asserted conflict of interests." *Harris*, 337 F.3d at 761 (emphasis added); *Moss*, 323 F.3d at 455 ("Indeed, where the defendant or his counsel objects to the conflict prior to, or during trial, the trial court must inquire as to the extent of the conflict or subject any subsequent conviction to automatic reversal."); *Smith*, 689 F.2d at 65 ("When the defendant, individually or through his legal representative, fails to raise his concern for a conflict in a timely fashion," an actual conflict of interest must be established to warrant relief). We are aware of a district court holding that the rule in *Holloway* does not apply when a defendant himself, rather than his counsel, objects to the multiple representation. *Riley v. South Carolina*, 82 F. Supp. 2d 474, 481 (D.S.C.), *appeal dismissed*, 225 F.3d 655, 2000 WL 1009026 (4th Cir. 2000) (unpublished). It makes little sense to deny effect to the objection of the defendant where his counsel was negligent or worse in tolerating a conflict of interest. However, we need not plumb the depths of this issue, since Daggs himself brought the conflict issue to the trial court's attention and the defendants then elaborated on the issue first raised by counsel.

the question of who in the house possessed the drugs was the source of a conflict. The court asked: "[I]s a part of your defense in this case, you know, that things that might have been found didn't belong to you; they might have belonged to someone else?" Reeves answered: "Yes."

A mother and daughter were charged with possession of drugs found in the house where both were living. They indicated that they would defend themselves on the theory that "someone else" owned the drugs and that they did not want to be represented by the same lawyer at trial. This is clear notice to the court of a concrete conflict of interest, sufficient to bring the case within the *Holloway* rule. *Holloway* does not require counsel to disclose trial strategy or to breach his duty of loyalty to either client in order to substantiate the existence of a conflict, *United States ex rel. Zembowski v. Robertis*, 771 F.2d 1057, 1063 (7th Cir. 1985), as Daggs would have done had he suggested to the court before which both Reeves's and McFarland's cases were then pending that it was Reeves's room where the drugs were found. *See Smith*, 689 F.2d at 64 n. 5 ("[W]e need only note the thorny issues raised by a judge's inquiry of counsel pertaining to concerns and problems in his defenses, especially since the judge may be the trier of fact and may impose sentence upon his clients if conviction results.").

Third, the objection was timely. McFarland's objection came before the beginning of trial. "[A] conflict of interest objection is timely not only when it is raised before trial, but also when it is raised during the course of the trial." *Harris*, 337 F.3d at 764 (citing *Holloway*, 435 U.S. at 495 n.4 (Powell, J., dissenting)); *accord Smith*, 689 F.2d at 62 (lawyer's objection on day of trial timely under *Holloway* where government moved to consolidate two cases at last moment); *United States ex rel. Ballard v. Bengston*, 702 F.2d 656, 663 (7th Cir. 1983) (motion one week before trial timely). *Holloway* specifically preserves the trial court's power to deal with defendants who make untimely motions for separate counsel in order to cause delay. 435 U.S. at 486-

87.  However, courts interpreting *Holloway* have recognized that the existence and extent of a conflict may only become clear as events unfold.  Trial courts may not rigidly insist on objection a certain amount of time before trial when circumstances have prevented counsel or the defendant from speaking up earlier.  *See Harris*, 337 F.3d at 764; *Smith*, 689 F.2d at 62; *Bengston*, 702 F.2d at 663.  McFarland attempted to explain to the trial court the reason for her delay in objecting–that she had tried to hire a separate attorney, but had not had enough money.  The trial court did not reject this explanation, but instead severed the cases for trial.

The Warden contends that McFarland's objection was untimely and therefore "forfeit[ed] as a matter of state law," citing *People v. Jones*, 423 N.W.2d 614 (Mich. Ct. App. 1988).  *Jones* does not involve a conflict of interest and merely concludes that Jones's request for substitute counsel was untimely, without even revealing when the motion was made.  Even if *Jones* gave us a state timeliness rule we could apply, which it does not, *Jones* does not purport to interpret the requirements of federal law as set forth in *Holloway*, which is the relevant question.

The question remains as to whether the trial court discharged its duty under *Holloway* by its inquiry and by severing Reeves's and McFarland's cases.  The various Circuits have somewhat different views concerning the nature and extent of the trial court's duty under *Holloway*.  In *Holloway* the trial court violated the defendants' rights when, after timely objection by defendants' counsel, "[t]he judge then failed either to appoint separate counsel or to take adequate steps to ascertain whether the risk was too remote to warrant separate counsel."  435 U.S. at 484.  The Tenth Circuit has held that this language outlines a duty (1) to obviate the risk by substituting conflict-free counsel or allowing the defendant to waive the conflict, or (2) to affirmatively establish that there is no conflict.  *See United States v. Gallegos*, 108 F.3d 1272, 1282 (10th Cir. 1997).  The Second Circuit has held that the trial court's duty under

*Holloway* is limited to the duty to inquire about the conflict, and that once inquiry has shown a possible conflict exists, the duty to rectify the situation is judged under the actual conflict standard, rather than the automatic-reversal rule of *Holloway*.  *United States v. Levy*, 25 F.3d 146, 154 (2d Cir. 1994).  It makes little sense to say that the burden of proving a Sixth Amendment violation increases as soon as the trial court's inquiry shows that a possible conflict exists, even though the court fails to respond appropriately to the conflict.  The Tenth Circuit has reasoned that unless the trial court's duty upon timely objection "encompasses a sound resolution of the conflict problem," the "inquiry mandated by *Holloway* would be an empty ritual."  *Selsor v. Kaiser*, 81 F.3d 1492, 1503 (10th Cir. 1996).  We view the Tenth Circuit's position as more consistent with *Holloway*, and accordingly we look to see whether the trial court affirmatively obviated the conflict by its response of severing the trials.

The Supreme Court has observed that providing separate trials significantly reduces the potential for conflict of interest from joint representation.  *See Burger v. Kemp*, 483 U.S. 776, 784 (1987) (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 347 (1980)).  Here, though the trials were separate, Daggs was still actively involved in Reeves's trial when he tried McFarland's case.  Reeves and McFarland were tried before different judges, beginning on April 5-6 and April 7, 1988, respectively.  Both trials were continued after the presentation of several witnesses, to wait for Agent Hawes, who was unavailable when the trials started and who testified on April 11 in both cases.  The April 11 hearing in McFarland's case began at 8:50 a.m. and ended at 9:25 a.m.  The last evidence and arguments in Reeves's case also occurred on April 11, 1988, but no time of day is noted.  Since Daggs was present at both hearings that day, we can infer that McFarland's happened first.  McFarland's trial was then continued to April 21, when the court made its findings.  Thus, Daggs was still actively involved in representing Reeves during McFarland's trial.  Though his actions in McFarland's case were not automatically before the trier of

fact in Reeves's case as they would have been in a joint trial, still any evidence or argumentation he developed against Reeves would instantly be made available to the prosecutor for use in Reeves's case. For instance, although in hindsight we know that Hawes would suggest in Reeves's case that the southeast bedroom was Reeves's, Daggs did not have the luxury of knowing that in advance. If he had brought this out in cross-examination in McFarland's case, for all he knew he might have been developing evidence the prosecutor had not yet seized on, which might have helped convict Reeves.

In *Harris v. Carter*, we held that severance did not obviate the conflict, even though Payton, one of the lawyer's two clients, had already been tried when he was called as a witness in Harris's case. Had the lawyer shown that Payton was lying at Harris's trial, he would have exposed Payton to perjury charges and revealed confidences from Payton. 337 F.3d at 762. The lawyer's continuing duty to Payton hobbled him in discharging his duty to Harris, and the trial court was bound under *Holloway* to recognize the lawyer's objection and look into the conflict the lawyer pointed out. *Id.* at 764. Similarly, in this case, had Daggs attempted to exonerate McFarland by showing that Reeves controlled the southeast bedroom, he would have compromised his duty to Reeves.

The Warden relies on *United States v. Mavrick*, 601 F.2d 921 (7th Cir. 1979), for the proposition that severance of McFarland's and Reeves's trials cured the conflict and rendered *Holloway* inapplicable. But in *Mavrick*, the defendants did not object to the conflict of interest, and when the trial court brought up the subject, counsel reported that the defendants did not want to be represented by separate counsel and that severance of their trials would eliminate the conflict. *Id.* at 928-30. As the Seventh Circuit noted, "[T]he events occurring prior to trial are almost exactly the opposite of those that triggered the trial court's duty of inquiry in *Holloway*." *Id.* at 930. The crucial event activating the *Holloway* rule, timely objection, was lacking in *Mavrick*, where the defendants resisted appointment of separate counsel

and counsel represented to the court that severance would eliminate any conflict. *Accord Wilson v. Morris*, 724 F.2d 591, 594 (7th Cir. 1984) (en banc) (counsel did not object except to refer to "potential conflict which could arise," but which would be remedied by severance; cases severed for trial, and *Holloway* not applicable). In contrast to *Mavrick*, McFarland objected to the multiple representation, and she certainly did not lead the court to believe that she considered her objection obviated by the severance.

We conclude that if McFarland's appellate counsel had raised the issue of trial counsel's conflict of interest in McFarland's state appeal, McFarland's conviction would have been reversed under the *Holloway* automatic-reversal rule.

B.

Under the rule of *Cuyler v. Sullivan*, 446 U.S. 335 (1980), when an attorney's representation of multiple defendants, though not objected to at trial, results in an actual conflict of interest that adversely affects the attorney's performance, the defendants' Sixth Amendment rights have been violated, even without a showing that the conflict caused the defendant to lose his or her case. *Id.* at 349-50 ("Thus, a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief.").

We have historically characterized *Sullivan* as requiring both "actual conflict" and "effect on representation" to establish a violation of the Sixth Amendment. *Thomas v. Foltz*, 818 F.2d 476, 481-82 (6th Cir. 1987). To prove that counsel's performance was affected by an "actual conflict," McFarland would have had to show that Daggs "made a choice between possible alternative courses of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other." *Id.* at 481 (quoting *United States v. Mers*, 701 F.2d 1321, 1328 (11th Cir. 1983)). "Effect on representation" meant that the conflict caused the attorney's

choice, not that the choice was prejudicial in any other way. *Id.* at 483. In *Mickens v. Taylor*, 535 U.S. 162, 172 n. 5 (2002), the Supreme Court modified this test by putting both the cause and effect elements into the phrase "actual conflict":

> [T]he *Sullivan* standard is not properly read as requiring inquiry into actual conflict as something separate and apart from adverse effect. An "actual conflict," for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance.

*Mickens* changed the terminology, but not the substance of the test we had applied previously, since the standard still requires a choice by counsel, caused by the conflict of interest. *See Moss v. United States*, 323 F.3d 445, 466-67 & n.23, 469 (6th Cir.), *cert. denied*, 124 S. Ct. 303 (2003).

Although the choice caused by the conflict does not have to be prejudicial in the sense of causing the defendant to lose the case, *Thomas*, 818 F.2d at 483, the reasonableness of counsel's choice can be relevant as a factor in proving the choice was caused by the conflict. A defendant or habeas petitioner does not have to produce direct evidence, such as the lawyer's testimony, that the lawyer chose to do one thing rather than another in order to accommodate another client's interests. Causation can be proved circumstantially, through evidence that the lawyer did something detrimental or failed to do something advantageous to one client that protected another client's interests. "[B]oth taking action and failing to take actions that are clearly suggested by the circumstances can indicate an adverse effect." *Mickens v. Taylor*, 240 F.3d 348, 360 (4th Cir. 2001) (en banc) (quotation marks omitted), *aff'd*, 535 U.S. 162 (2002). "[T]he existence of an actual conflict and adverse effects from it are more likely to be evident in cases in which an attorney takes positive steps on behalf of one client prejudicial to another than in cases in which the attorney's actions are based on inaction and are passive . . . ." *United States v. Gambino*, 864 F.2d 1064, 1070 (3d Cir. 1988).

There has been some difference in opinion among the Circuits about when foregoing an available defense because of a conflict of interest constitutes evidence of "adverse effect." Some Circuits hold that whenever counsel failed to pursue a "plausible" defense "that was inherently in conflict with or not undertaken due to the attorney's other loyalties," there is sufficient evidence of adverse effect to show a Sixth Amendment violation. *Winkler v. Keane*, 7 F.3d 304, 309 (2d Cir. 1993); *Gambino*, 864 F.2d at 1070; *United States v. Fahey*, 769 F.2d 829, 836 (1st Cir. 1985). Other Circuits also require that the foregone defense be "reasonable." *Freund v. Butterworth*, 165 F.3d 839, 860 (11th Cir. 1999) (en banc) (showing of adverse effect requires proof of tactic foregone, of reasonableness of tactic on facts, and of a causal link between conflict and decision to forego tactic); *Mickens*, 240 F.3d at 361 (same).

This Circuit has been quite rigorous in demanding more than omission of a hypothetical or "potential" defense to establish adverse effect. *See O'Guin v. Foltz*, 715 F.2d 397, 400-01 (6th Cir. 1983). Under our cases, counsel's choice to forego a defense that would have been inconsistent with counsel's duty to another client is evidence of adverse effect only if it is clear that the choice was not part of a legitimate strategy, judged under the deferential review of counsel's performance prescribed in *Strickland v. Washington*, 466 U.S. 668 (1984). In *United States v. Mays*, 77 F.3d 906, 908 (6th Cir. 1996), we rejected an argument that a conflict caused a lawyer's actions where "arguably unwise questions by defense counsel of prosecution witnesses appear to have been part of a losing strategy but they were not *the result of choices made where there were clearly better alternatives*." (Emphasis added.) In *Riggs v. United States*, 209 F.3d 828, 833 (6th Cir. 2000), there was no proof of adverse effect where counsel failed to request an instruction to which the defendant would have had no right. Even where the lawyer omitted some course of action that undoubtedly would have been advantageous to the defendant, there is no proof of adverse effect if there is some other adequate explanation for the

omission, *see Moss v. United States*, 323 F.3d 445, 470 (6th Cir.) (lack of plea negotiations resulted from defendant's protestations of innocence), *cert. denied*, 124 S Ct. 303 (2003), or if the lawyer was ignorant of the facts giving rise to the conflict, *United States v. Hopkins*, 43 F.3d 1116, 1118-19 (6th Cir. 1995). These cases are consistent with the Supreme Court's methodology in *Burger v. Kemp*, 483 U.S. 776 (1987). There, counsel's omission of a defense pointing the finger at another person was not evidence counsel was motivated by loyalty to the other person, since the decision had a "sound strategic basis." *Id.* at 784.

On the other hand, where counsel's choices worked to the defendant's detriment but to the benefit of another client, and there was no other explanation for counsel's choices, we have considered the choices themselves evidence of disloyalty. For instance, in *United States v. Boling*, 869 F.2d 965, 972 (6th Cir. 1989), the defendant's counsel also represented a co-defendant to some extent in a related matter, and had represented the co-defendant in the past. Counsel pursued a "common defense" strategy, which resulted in failing to call witnesses favorable to the defendant and unfavorable to the co-defendant and failing to cross-examine the co-defendant. We held the strategy was "unquestionably . . . very harmful" to the defendant and constituted a violation of her Sixth Amendment rights. Similarly, in *United States v. Hall*, 200 F.3d 962, 966-67 (6th Cir. 2000), we held that counsel's actions were affected by a conflict when he failed to point out that there was virtually no evidence linking one of his clients to cocaine, and the only evidence supporting the conviction resulted from defendant's answer to a poorly phrased question, to which counsel should have objected.

Thus, where counsel fails to pursue a strong and obvious defense, when pursuit of that defense would have inculpated counsel's other client, and where there is no countervailing benefit to the defendant from foregoing that defense or other explanation for counsel's conduct, these facts amount to evidence of disloyalty under any interpretation of *Sullivan*.

*See Lockhart v. Terhune*, 250 F.3d 1223, 1230-32 (9th Cir. 2001) (adverse effect found where petitioner's trial counsel also represented another person implicated in a killing; counsel failed to make use of "obvious defense" that other client was the killer and Ninth Circuit could "discern no tactical justification" for counsel's decision); *Griffin v. McVicar*, 84 F.3d 880, 886-91 (7th Cir. 1996) (actual conflict where counsel presenting joint defense failed to present best defense that petitioner's co-defendant, rather than petitioner, shot victim); *United States v. Romero*, 780 F.2d 981, 986-87 (11th Cir. 1986) (actual conflict where defendant's "status as a low level employee [in drug operation] made a shifting blame defense extremely feasible and . . . such a defense was completely foreclosed to him because it would have implicated his codefendant and another client of his attorney."); *United States v. Levy*, 25 F.3d 146, 157-58 (2d Cir. 1994) (actual conflict where attorney forewent plausible strategy of blaming another of attorney's clients); *Fitzgerald v. United States*, 530 A.2d 1129, 1138-41 (D.C. Ct. App. 1987) (where guns and drugs found in various rooms of house, joint representation led to actual conflict preventing family members from arguing that other members possessed contraband).

The record shows that McFarland's best defense would have been to contend that the drugs belonged to Reeves and not to McFarland. Under Michigan law, in order to convict McFarland of possession of the drugs, the State had to prove that she exercised control or had the right to exercise control over them. *People v. Konrad*, 536 N.W. 2d 517, 521 (Mich. 1995); *People v. Davenport*, 197 N.W. 2d 521, 523-24 (Mich. Ct. App. 1972), *disapproved on other grounds*, *People v. Nash*, 313 N.W.2d 307 (Mich. Ct. App. 1981). There was strong evidence indicating that Reeves, not McFarland, controlled the drugs found in the locked southeast bedroom. Agent Michael Hawes said that police had received Crack Hotline telephone complaints about "Donna," and during the investigation that led to the search, the confidential informant had talked to "Donna," who confirmed that she had dilaudids,

but would not sell them to someone she did not know. The southeast bedroom contained items that could have been linked either to Reeves or McFarland, such as women's clothing and mail, money order receipts, and other documents with Reeves's or McFarland's name. Agent Hawes referred to the southeast bedroom as Reeves's room, and he referred to the second bedroom as McFarland's. Agent Hawes said the purse with the pen gun and the letter or card addressed to McFarland was found in the second bedroom, not the bedroom with the drugs and prescription forms.

In McFarland's trial, Daggs not only failed to argue that Reeves was guilty, but he affirmatively argued that she was innocent. He argued in closing, "There's been no showing here by the prosecution that either Paula McFarland or Donna Reeves . . . had possession or control of any narcotic . . . ." In presenting the joint defense, he neglected to point out that the southeast bedroom appeared to be Reeves's room and even seemed to concede that it was McFarland's room:

> I'm assuming if we had two men living there at the same time we had two women they were probably maybe sharing bedrooms so how can we say that Paula McFarland would be guilty of possession and control of narcotics and not the person maybe who was sharing the bedroom with her. That person could have just as easily bought [sic] those pills in there. The same with Donna Reeves.

The burden of exculpating Reeves during McFarland's trial caused Daggs to make implausible arguments that would not have been necessary had he been defending McFarland alone. For instance, Daggs addressed the report by the confidential informant about trying to buy drugs at the house:

> They says some white lady came to the door, well so what? You knock on my door I'm going to probably come to the door, too. . . . But there wasn't any buy

made. So how can you associate either–I mean Miss Paula McFarland with anything.

Daggs left the impression that it might have been McFarland who talked to the confidential informant and that he had to discredit the confidential informant's report to defend McFarland, when it was Reeves who was implicated by the informant. He argued that neither of the women was involved with the drugs, even though there were women's clothes in the closet in the southeast bedroom; while it was plausible that one woman in the house was innocent of involvement with the drugs, it was far less plausible that both were. Daggs thus took on a heavier burden than would have been necessary in defending McFarland alone. *See Griffin*, 84 F.3d at 890 (habeas granted where counsel presenting joint defense pursued a theory so far-fetched that "no effective attorney representing Griffin alone would have resorted to it"). Moreover, Daggs failed to adduce any evidence that Reeves even lived at the house, as the prosecutor noted in his summation in McFarland's trial. ("There's been no direct testimony that Donna Reeves lived there.")

Instead of the obvious defense of inculpating Reeves, Daggs chose to point the finger at Eaton and Rayford. Eaton, though present at the time of the search, had no key to the locked room. Rayford was not present at the house during the search and was linked to the house only by the presence of documents, including a marriage license bearing his name and Reeves's and some letters addressed to him at the house, and the possible inference that he was the male described in the search warrant.

Daggs's duty of loyalty to Reeves would have been breached had he actively pursued a theory that she was guilty of the charges while he was currently representing Reeves in a trial on those same charges; had Daggs developed and presented evidence and arguments establishing Reeves's guilt, for example, by calling McFarland or Eaton to testify, or by bringing out on cross-examination that Hawes understood the

southeast bedroom to be Reeves's, Daggs's work product could have been used against his own client. *See* Mich. Rules of Prof'l Conduct R. 1.7 (1985) ("A lawyer shall not represent a client if the representation of that client will be directly adverse to another client . . . .").

The district court found that Daggs's decision to argue that neither Reeves nor McFarland possessed the drugs, instead of contending that Reeves was the owner, resulted from his conflict of interest. The district court found that "Daggs' decision to present a common defense harmful to [McFarland] was the result of his desire to protect Reeves' interests and thus indicative of his struggle to serve two masters." (quotation marks omitted). The district court specifically found that because McFarland and Reeves were tried separately, there was no countervailing advantage to McFarland from the common defense strategy pursued by Daggs. The district court held that this evidence proved that Daggs made a choice in his representation of McFarland that was caused by his conflict of interest. The district court's finding of subjective motivation is not clearly erroneous. *See Burger v. Kemp*, 483 U.S. at 785.

This case therefore presents an actual choice by McFarland's counsel to forego an obvious and strong defense to avoid inculpating another client. The district court's legal conclusion that Daggs labored under an actual conflict of interest establishing a Sixth Amendment violation under *Sullivan* is correct.

At the time of McFarland's appeal, the Michigan Court of Appeals would, of course, have followed *Sullivan*. *See, e.g., People v. Rhinehart*, 385 N.W.2d 640, 641 (Mich. Ct. App. 1986). Had McFarland's counsel raised this argument on appeal, McFarland should have prevailed.

## C.

McFarland also argues that Daggs's errors and omissions violated her Sixth Amendment rights, even without regard to whether Daggs was subject to a conflict of interest. Under the rule of *Strickland v. Washington*, 466 U.S. 668 (1984), a defendant's right to effective assistance of counsel is violated where counsel's representation "fell below an objective standard of reasonableness," *id.* at 688, and where there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694.

The district court did not reach the claim of ineffective assistance of counsel under the *Strickland* standard. However, without repeating our discussion in Part II B, it is clear that McFarland had a strong argument that Reeves occupied the locked southeast bedroom and possessed the drugs found there.

Under Michigan law, the State only needed to prove that McFarland had joint, not exclusive, possession of the drugs. *People v. Konrad*, 536 N.W.2d 517, 521 (Mich. 1995). McFarland's name appeared on numerous documents found in the dresser of the southeast bedroom, so there was some evidence linking her to the drugs. Still, in order to prevail under *Strickland*, it was not necessary to prove McFarland would necessarily have prevailed at trial, only that there was a "reasonable probability" that she would have done so.

After McFarland's trial, the trial judge mentioned her own misgivings about the sufficiency of the evidence connecting McFarland to the drugs. How much more doubt would she have felt if she had been made aware of the many documents with *Reeves's* name found in the dresser of the southeast bedroom? Or of the fact that McFarland's purse was found in the second bedroom, not the bedroom with the drugs? Or if Hawes had testified, as he did in Reeves's case, that the southeast bedroom was Reeves's and the second bedroom

was McFarland's? Or if counsel had brought out the exchange between the confidential informant and "Donna"? Reeves's connection with the locked room was strong enough to raise a reasonable probability that McFarland's trial would have had a different outcome if her lawyer had actively pursued the defense that the southeast bedroom and the drugs in it belonged to Reeves and to make it unreasonable for Daggs to have failed to do so.

We conclude that if state appellate counsel had argued that Daggs's failure to contend that the drugs belonged to Reeves was ineffective assistance of counsel, McFarland should have won her appeal.

### III.

Having decided that McFarland would likely have prevailed on her appeal if counsel had argued that her trial counsel was ineffective, we must still decide whether appellate counsel's failure to raise the argument was sufficiently unreasonable to  violate McFarland's right to counsel.

Failure of appellate counsel to raise an issue can amount to constitutionally ineffective assistance. *E.g., Joshua v. Dewitt*, 341 F.3d 430, 441 (6th Cir. 2003); *Lucas v. O'Dea*, 179 F.3d 412, 419 (6th Cir. 1999); *Mapes v. Coyle*, 171 F.3d 408, 427-29 (6th Cir. 1999). However, counsel has no obligation to raise every possible claim, *see Jones v. Barnes*, 463 U.S. 745, 751-54 (1983), and the decision of which among the possible claims to pursue is ordinarily entrusted to counsel's professional judgment, *see Smith v. Murray*, 477 U.S. 527, 536 (1986). "Counsel's performance is strongly presumed to be effective." *Scott v. Mitchell*, 209 F.3d 854, 880 (6th Cir. 2000) (citing *Strickland*, 466 U.S. at 690). Even if counsel made a mistake, the mistake might not be serious enough to have affected the defendant's constitutional right to counsel. *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001), *cert. denied*, 535 U.S. 940 (2002).

We have identified a list of relevant factors which help us distinguish a case of ineffective assistance of appellate counsel from the case in which counsel's decision to omit an argument on appeal falls within the realm of acceptable professional performance:

(1)  Were the omitted issues "significant and obvious"?
(2)  Was there arguably contrary authority on the omitted issues?
(3)  Were the omitted issues clearly stronger than those presented?
(4)  Were the omitted issues objected to at trial?
(5)  Were the trial court's rulings subject to deference on appeal?
(6)  Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?
(7)  What was appellate counsel's level of experience and expertise?
(8)  Did the petitioner and appellate counsel meet and go over possible issues?
(9)  Is there evidence that counsel reviewed all the facts?
(10)  Were the omitted issues dealt with in other assignments of error?
(11)  Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

*Mapes*, 171 F.3d at 427-28.

We have already decided in part II, *supra*, that McFarland received ineffective assistance of trial counsel, which should have led to reversal of her conviction. It therefore follows that this argument was stronger than the seven arguments counsel raised on direct appeal. One of those arguments resulted in McFarland's sentence being reduced from twenty to thirty years to ten to thirty years; nevertheless, it goes without saying that a defendant would prefer a reversal to resentencing.

Further, the conflict issue was obvious. Appellate counsel testified he was aware that McFarland and Reeves were represented by the same attorney at trial. The colloquy containing McFarland's request for separate counsel appears in the trial transcript, as does the evidence pointing to Donna Reeves's occupancy of the southeast bedroom where the contraband was found. The brief on direct appeal included a challenge to the sufficiency of the evidence and included extensive citation to the trial transcript, thus showing counsel possessed a thorough knowledge of the transcript. One of the points counsel did raise on appeal concerned the sufficiency of the affidavit supporting the search warrant; this affidavit stated that the confidential informant had tried to buy drugs from "Donna" and that Donna replied that she had dilaudids but would not sell them to someone she did not know. Thus, it is beyond dispute that appellate counsel had information before him that pointed to the defense that the drugs belonged to Donna Reeves, that appellate counsel knew Donna Reeves and McFarland were represented by the same attorney at trial, and that they had unsuccessfully sought separate counsel.

The Sixth Amendment violation would have resulted in automatic reversal under the rule in *Holloway*. It is therefore difficult to excuse counsel's failure to argue a point that would have led so expeditiously to reversal of the conviction.

Sometimes, omission of certain arguments or evidence is shown by the attorney's testimony to have been a reasonable strategic decision or to be the result of factors beyond the attorney's control. *See Scott*, 209 F.3d at 880-81 (decision not to present mitigating evidence part of strategy to keep defendant's criminal history from jury); *Mapes*, 171 F.3d at 430 (Siler, J., concurring and dissenting) ("[Counsel] may have had strategic reasons for omitting the issue, or his client may have requested that it be omitted."). That is not the case here. Appellate counsel testified that he could not even recall whether he had raised a claim of conflict of interest on McFarland's behalf. Moreover, appellate counsel himself represented both McFarland and Reeves on appeal. It would

have been difficult, if not impossible, for appellate counsel to argue that trial counsel's conflict prevented trial counsel from pointing the finger at Reeves when appellate counsel was also representing Reeves on appeal. This spectre of yet another conflict of interest contributes to McFarland's showing of ineffective assistance of appellate counsel. *See Greer v. Mitchell*, 264 F.3d 663, 680 (6th Cir. 2001), *cert. denied*, 535 U.S. 940 (2002).

We conclude that appellate counsel's ineffectiveness was the cause for McFarland's failure to raise ineffectiveness of trial counsel on appeal. Because we have already held that the ineffectiveness claim was meritorious and should have resulted in a reversal of McFarland's conviction, there is no question but that appellate counsel's errors were prejudicial. Consequently, McFarland has shown cause and prejudice excusing her failure to raise ineffective assistance of trial counsel on her direct appeal. Nothing, therefore, bars her from litigating this claim.

IV.

The Warden argues that the district court erred in allowing McFarland the evidentiary hearing at which appellate counsel testified. The district court found that McFarland "diligently requested an evidentiary hearing on the issue of ineffective assistance of counsel at every stage of her post-conviction proceedings in the Michigan courts." Since McFarland was denied such a hearing, she was therefore entitled to present evidence in the habeas proceeding on the subject of whether her appellate counsel was ineffective. The Antiterrorism and Effective Death Penalty Act outlines a heightened standard for a petitioner seeking an evidentiary hearing if the petitioner has "failed to develop the factual basis of a claim in State court proceedings." 28 U.S.C. § 2254(e)(2) (2000). We have held that a petitioner who was diligent in seeking a state evidentiary hearing, but whose requests were denied in the state courts, did not "[fail] to develop the factual basis of the claim" and therefore the heightened standard of § 2254(e)(2)

was inapplicable. *Greer v. Mitchell*, 264 F.3d 663, 681 (6th Cir. 2001) (quoting *Williams v. Taylor*, 529 U.S. 362, 432 (2000)) (petitioner was diligent in seeking hearing on ineffective assistance of appellate counsel claim in state post-conviction proceedings; therefore, petitioner was entitled to hearing on claim in federal habeas), *cert. denied*, 535 U.S. 940 (2002); *Sawyer v. Hofbauer*, 299 F.3d 605, 610 (6th Cir. 2002). *But cf. Martin v. Mitchell*, 280 F.3d 594, 615 (6th Cir. 2002) (holding that petitioner who failed to raise ineffective assistance of trial counsel on direct appeal had therefore "failed to develop the factual basis" of that claim, even though petitioner argued that failure was due to ineffective assistance of appellate counsel), *cert. denied*, 537 U.S. 1004 (2002) and 123 S. Ct. 2601 (2003). The Warden does not dispute the district court's finding that McFarland sought an evidentiary hearing in her state postconviction motion and that no hearing was allowed by the state courts. The record before us does not contain the motion itself, but it does contain McFarland's postconviction brief to the Michigan Supreme Court, which specifically requests an evidentiary hearing. The postconviction motion was McFarland's first opportunity to raise the ineffectiveness of her appellate counsel. Accordingly, the heightened standard of § 2254(e)(2) does not apply to McFarland's case and the district court did not violate § 2254(e)(2) in affording her a hearing on the subject of her appellate counsel's representation.

## V.

Because this case was filed after the effective date of the Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, Tit. I, § 104, 110 Stat. 1218 (1996), amending 28 U.S.C. § 2254, in order to decide whether habeas was properly granted, it is not enough to decide whether there was a violation of McFarland's constitutional rights. We must further determine whether the constitutional claim was adjudicated on the merits in state court proceedings. If so, a writ of habeas corpus may only be granted if the state adjudication (1) "resulted in a decision that was contrary to,

or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

The only state court decision on the merits in this case is the trial court's response to McFarland's objection to having to proceed to trial with the same counsel as Reeves. At that time, McFarland's actual conflict claim, which depends on the existence of an adverse effect on Daggs's representation, and her *Strickland v. Washington*, 466 U.S. 668 (1984), claim, which depends on Daggs's omission of a defense at trial, had not matured and so could not possibly have been included in the trial court's ruling. It therefore appears that the *Cuyler v. Sullivan*, 446 U.S. 335 (1980), and *Strickland* claims must be reviewed de novo, rather than under the heightened standard of review appropriate for claims that have been adjudicated on the merits in state courts. *See Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003) ("Where, as here, the state court did not assess the merits of a claim properly raised in a habeas petition, the deference due under the AEDPA does not apply."). As we have already determined that McFarland established Sixth Amendment violations on both the *Sullivan* and *Strickland* claims, no further analysis is necessary to establish her right to relief on those claims.

The *Holloway v. Arkansas*, 435 U.S. 475 (1978), claim (see *supra* at Part II.A.), however, is subject to the heightened AEDPA standard. Under the first clause of § 2254(d), a state court decision is "contrary to [the Supreme Court's] clearly established precedent if the state court . . . confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Lockyer v. Andrade*, 538 U.S. 63, 123 S. Ct. 1166, 1173 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). This

scenario fits McFarland's case precisely. McFarland, like the petitioners in *Holloway*, objected before trial to having to proceed to trial with one counsel for two defendants. Although the trial court severed McFarland's trial from her co-defendant's, which we have determined did not obviate the conflict of interest, McFarland, like the *Holloway* petitioners, was forced, over her objection, to go to trial with counsel who was actively representing a co-defendant. Forcing McFarland to go to trial with conflicted counsel contradicts the clearly established precedent of *Holloway v. Arkansas*. McFarland has shown that she is entitled to relief under the AEDPA.

\*\*\*

For all of the reasons set forth above, we affirm the district court's grant of the conditional writ of habeas corpus.