*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0335p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

TERRANCE BOYKIN,

　　　　　　*Petitioner-Appellant,*

　　　*v.*

PATTI WEBB,

　　　　　　*Respondent-Appellee.*

No. 06-5775

>

---

Appeal from the United States District Court
for the Western District of Kentucky at Paducah.
No. 05-00153—Thomas B. Russell, District Judge.

Argued: June 10, 2008

Decided and Filed: September 4, 2008

Before: MARTIN and BATCHELDER, Circuit Judges; JORDAN, Senior District Judge.[*]

---

## COUNSEL

**ARGUED:** Brenda Popplewell, BRENDA POPPLEWELL, ATTORNEY AT LAW, Somerset, Kentucky, for Appellant. Michael L. Harned, II, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, for Appellee. **ON BRIEF:** Brenda Popplewell, BRENDA POPPLEWELL, ATTORNEY AT LAW, Somerset, Kentucky, for Appellant. Michael L. Harned, II, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, for Appellee.

　　　MARTIN, J., delivered the opinion of the court, in which JORDAN, D. J., joined. BATCHELDER, J. (pp. 10-13), delivered a separate dissenting opinion.

---

## OPINION

---

　　　BOYCE F. MARTIN, JR., Circuit Judge. Terrance Boykin petitioned the district court for a writ of habeas corpus. Boykin sought to overturn his state conviction for complicity to murder and wanton endangerment, arguing that he received ineffective assistance of counsel. According to Boykin, because his trial counsel represented both Boykin and his co-defendant Treon McElrath, trial counsel could not pursue facts that would have exculpated Boykin but inculpated McElrath, and thus trial counsel's performance was constitutionally ineffective. Boykin also argues that he

---

[*] The Honorable R. Leon Jordan, Senior United States District Judge for the Eastern District of Tennessee, sitting by designation.

1

received ineffective assistance of counsel on appeal due to the same conflict of interest. We agree with Boykin and find that his right to counsel was violated due to ineffective assistance of counsel, and REVERSE the district court's denial of his petition for a writ of habeas corpus.

I.

Boykin was tried along with his co-defendants Treon McElrath and Andra Everett in Hickman County Circuit Court for the murder of Natasha Wilson and related charges. Boykin and McElrath, who are cousins, were represented by the same attorney at trial, while Everett was represented by separate counsel. All three were convicted of one count of complicity to murder and six counts of complicity to wanton endangerment, and received sentences of 52 years' imprisonment.

The jury heard evidence that on the evening of June 21, 1998, Natasha Wilson and her boyfriend Corey Fitts were sitting on the front porch of her grandmother's house in Clinton, Kentucky. While sitting on the porch, Wilson and Fitts observed McElrath drive his yellow Mustang by her house. Wilson called the police asking for protection from McElrath, and his cousin, Boykin. Wilson had reason to fear Boykin because she had recently taken out a warrant against him for unlawful imprisonment, burglary and sexual abuse. Fitts was also in fear as he had recently filed charges against Boykin and Everett for terroristic threatening. Wilson's call came in to the police department at approximately 9:12 p.m.

Police Officer Brian Morrison had been driving near Wilson's grandmother's house before Wilson initially called the police for protection. Wilson had seen McElrath driving his yellow Mustang with three individuals in the car with him. He could not identify the other three individuals because they had ducked down inside the car. After seeing McElrath and the Mustang, Morrison received a call from dispatch that Natasha Wilson had called seeking protection from McElrath and Boykin. Morrison returned to the dispatch office and ran a check to see if McElrath had any outstanding warrants.

At approximately 9:23 p.m., Morrison received a call from Wilson's grandmother stating that Wilson had been shot. Morrison immediately drove to the scene of the shooting. When he entered the house, he saw blood on the carpet just inside the door and also on the wall. He found Wilson lying on the floor with gunshot wounds in her wrist and shoulder; she was gasping for breath. Morrison radioed for emergency medical service and back-up, and then performed CPR on Wilson. Wilson ultimately died as a result of the gunshot wounds, and was unable to talk to Morrison before passing away.

Wilson's boyfriend, Corey Fitts, was the only eye-witness to the murder. At the scene, he told police that he and Wilson had been sitting on the porch when they saw McElrath drive his yellow Mustang by the house. He and Wilson became concerned and called the police. About twenty minutes later, two men came around the corner of the house and began shooting. He and Wilson ran into the house. That night, Fitts could only identify McElrath as one of the shooters. However, at trial, Fitts identified Boykin and Everett as the shooters.

Brothers Eric and Sammy Hunter were home visiting their parents on the night of the shooting. Their parents lived near the murder scene. While they were visiting their parents, McElrath came by unannounced and unexpectedly to visit with them. Ten minutes after McElrath arrived, they heard gunfire. As soon as they heard the gunshots, McElrath left.

On the night of the shooting, Officer Cummings of the Union City, Tennessee Police Department saw Boykin and McElrath together in Union City before 9:00 p.m. Apparently, Union City is very close to Clinton, Kentucky. Cummings stopped McElrath's car at 6:27 p.m. for a traffic

violation; Boykin was in the passenger seat. Cummings was well enough acquainted with the two to know them by sight.

Later that night, after receiving a call about the shooting and the suspected involvement of McElrath and Boykin, Cummings went to McElrath and Boykin's grandmother's home, where McElrath was known to reside. He arrived at 9:57 p.m. and found Boykin and McElrath in front of the house. The yellow Mustang was also there. A search warrant executed on the residence revealed a Llama .45 handgun and ammunition in a bedroom closet. Two .45 cartridge casings and a .45 bullet recovered at the murder scene were identified as having come from the Llama .45 handgun.

## II.

At trial, the prosecution called as witnesses Officer Morrison, Corey Fitts, Kelta O'Neil, the coroner, Officer Cummings, and Eric and Sammy Hunter. They testified to the facts presented above. Boykin's attorney only called one witness in his defense, the ballistics expert, who testified that Fitts could not have been the shooter.

On September 28, 2000, the Kentucky Supreme Court affirmed Boykin's and McElrath's convictions on direct appeal; and denied rehearing on April 26, 2001. On August 21, 2001, Boykin filed a pro se motion under Kentucky Rule of Criminal Procedure 11.42 alleging ineffective assistance of counsel at trial and on direct appeal. The Hickman Circuit court denied the motion, and the Kentucky Court of Appeals also denied the motion. The Kentucky Supreme Court denied discretionary review.

Boykin then filed a petition for writ of habeas corpus in the Western District of Kentucky. The district court adopted the magistrate judge's report and recommendations denying Boykin's petition.

## III.

1.      *Standard of Review*

We review de novo a district court's legal conclusions and mixed questions of law and fact, and we review its factual findings for clear error. *Armstrong v. Morgan*, 372 F.3d 778, 781 (6th Cir. 2004); *Lucas v. O'Dea*, 179 F.3d 412, 416 (6th Cir. 1999). Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a district court shall not grant a habeas petition with respect to any claim that was adjudicated on the merits in the state courts unless the adjudication resulted in a decision that (1) was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court; or (2) was based on an unreasonable determination of the facts in light of the evidence presented to the state courts. 28 U.S.C. § 2254(d).

Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court on materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct legal principle from the Supreme Court's decisions but unreasonably applies it to the facts of the petitioner's case. *Id.* The court may look to lower courts of appeals' decisions, not as binding precedent, but rather to inform the analysis of Supreme Court holdings to determine whether a legal principle had been clearly established by the Supreme Court. *Hill v. Hofbauer*, 337 F.3d 706, 716 (6th Cir. 2003). Finally, the habeas petitioner has the burden of rebutting, by clear and convincing evidence, the presumption that the state court's factual findings were correct. *See* 28 U.S.C. § 2254(e)(1); *McAdoo v. Elo*, 365 F.3d 487, 493-94 (6th Cir. 2004).

2.        *Boykin's Claim of Ineffective Assistance of Trial Counsel Due to a Conflict of Interest.*

The Supreme Court set forth the standard for reviewing claims of ineffective assistance of counsel resulting from a conflict of interest in *Cuyler v. Sullivan*, 446 U.S. 335 (1980), and summarized it again in *Strickland v. Washington*, 466 U.S. 668, 692 (1984). "[P]rejudice is presumed when counsel is burdened by an actual conflict of interest. In those circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests." *Strickland*, 466 U.S. 668, 692 (1984) (citing *Sullivan*, 446 U.S. at 345-50). However, "[p]rejudice is presumed only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" *Id.* (quoting *Sullivan*, 446 U.S. at 350, 348). This Circuit has held that it is not necessary to show that "the conflict caused the defendant to lose his or her case," *McFarland v. Yukins,* 356 F.3d 688, 705 (6th Cir. 2004); all that is necessary is that an actual conflict of interest adversely affected the attorney's performance, *Id.*

Reviewing the record, it appears Boykin has two arguments for conflict of interest: (1) the trial court failed to properly inquire into whether Boykin had knowingly waived his right to be represented by separate counsel as required by Kentucky Rule of Criminal Procedure 8.30, and (2) Boykin's trial counsel labored under an actual conflict of interest that adversely affected his performance.

A.        *Kentucky Rule of Criminal Procedure 8.30*

Kentucky's Rule of Criminal Procedure 8.30 directly addresses the issue of an attorney's representation of multiple co-defendants. Rule 8.30 is intended to protect defendants from the potential consequences of dual representation and assure that they are advised of potential conflicts of interest. Rule 8.30(1) prohibits dual representation of persons charged with the same offenses unless:

> (1) the judge . . . explains to the defendant or defendants the possibility of a conflict of interest on the part of the attorney in that what may be or seem to be in the best interest of one client may not be in the best interests of another, and (b) each defendant in the proceeding executes and causes to be entered in the record a statement that the possibility of a conflict of interests on the part of the attorney has been explained to the defendant by the court and that the defendant nevertheless desires to be represented by the same attorney.

It is uncontroverted that the state trial court violated Rule 8.30(1). During trial counsel's first appearance on the record, he informed the trial court that he was representing both Boykin and McElrath. The trial court questioned trial counsel regarding whether there were any conflicts of interest arising out of the dual representation. Trial counsel responded that both Boykin and McElrath had signed Rule 8.30(1) waivers. However, the record only shows that McElrath signed a waiver that was filed with the trial court.

The question becomes whether or not the trial court was under a constitutional duty to inquire further into the conflict of interest. In *Holloway v. Arkansas*, the Supreme Court held that state trial courts are required to investigate timely objections to multiple representation. 435 U.S. 475, 483-487. But the Supreme Court substantially limited that duty to investigate in *Sullivan*. There the Court stated that "nothing in our precedents suggests that the Sixth Amendment requires state courts themselves to initiate inquiries into the propriety of multiple representation in every case." *Sullivan*, 446 U.S. at 346-47. The Court instead put the onus on defense counsel, who "have an ethical obligation to avoid conflicting representations and to advise the court promptly when a

conflict of interest arises during the course of trial." *Id.* Accordingly, post-*Sullivan*, "[a]bsent special circumstances, . . . trial courts may assume either that multiple representation entails no conflict or that the lawyer and his clients knowingly accept such risk of conflict as may exist." *Id.* at 346-47. The Court specifically stated that "[u]nless the trial court knows or reasonably should know that a particular conflict exists, the court need not initiate an inquiry." *Id.* at 347.

This Circuit has held that the duty of the trial court to inquire in to a possible conflict of interest under *Sullivan* is limited "to cases in which a defendant has timely objected . . . ." *McFarland v. Yukins*, 356 F.3d 688, 701 (6th Cir. 2004). As both the Kentucky Court of Appeals and the district court found, Boykin did not object during his trial. Thus, under *Sullivan*, the trial court was under no duty to investigate further into a possible conflict of interest. In fact, the trial court questioned Boykin and McElrath's counsel regarding a possible conflict of interest, and trial counsel represented that no conflict existed. As the Supreme Court has held, the burden is on trial counsel to inform the court of any possible conflict. Where, as here, the court was informed that no conflict existed or that the co-defendants knowingly accepted the risk of a conflict of interest, the trial court is allowed to rely on that information and not inquire further. *Sullivan*, 446 U.S. at 346-47.

While joint representation is not conclusive of a Sixth Amendment violation, it must be noted that nowhere in the record is there any evidence that Boykin was made aware of a possible conflict of interest in his attorney's joint representation of Boykin and McElrath. Boykin cannot argue that because he was unaware of this possible conflict when he agreed to joint representation, a per se violation of his Sixth Amendment right to effective counsel occurred. This certainly informs our analysis going forward as to the effectiveness of his trial counsel and the degree of oversight employed by the trial court.

### B. *Actual Conflict*

In order to show that his counsel's performance was adversely affected by an actual conflict of interest, Boykin must show that his attorney "made a choice between possible alternative courses of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other." *McFarland*, 356 F.3d at 701. "A defendant or habeas petitioner does not have to produce direct evidence, such as the lawyer's testimony, that the lawyer chose to do one thing rather than another in order to accommodate another client's interests. Causation can be proved circumstantially, through evidence that the lawyer did something detrimental or failed to do something advantageous to one client that protected another client's interests." *Id.* at 706. This Circuit requires that a defendant show that trial counsel's choice "to forego a defense that would have been inconsistent with counsel's duty to another client is evidence of adverse effect only if it is clear that the choice was not part of a legitimate strategy, judged under the deferential review of counsel's performance prescribed in *Strickland*. . . ." *Id.* "Thus, where counsel fails to pursue a strong and obvious defense, when pursuit of that defense would have inculpated counsel's other client, and where there is no countervailing benefit to the defendant from foregoing that defense or other explanation for counsel's conduct, these facts amount to evidence of disloyalty under any interpretation of *Sullivan*." *Id.* at 707.

Boykin argues that his best defense would have been to point the finger at McElrath as the shooter, while developing an alibi that Boykin was in Tennessee with his grandmother at the time of the shooting. The following facts support this defense theory:

- Several witnesses, including police, placed McElrath and his yellow Mustang convertible near the scene of the crime along with three other black males, but none of the witnesses personally saw Boykin with McElrath on the night of the shooting.

- Fitts, the only adult eyewitness to the shooting, first told police on the night of the shooting that "Treon [McElrath] done it."

- Fitts also told police that the gunmen had scarves over their faces.

- Wilson's five-year-old son identified the shooters as Treon McElrath and Andre Everett.

- Fitts identified Boykin as a shooter days later after extensive police questioning.

- The murder weapon was found in a closet at McElrath's (and Boykin's) grandmother's house, and a clip for the gun was found in McElrath's car.

- Boykin and McElrath's grandmother stated that Boykin was with her in Union City, Tennessee at the time of the shooting.

- McElrath told police that Everett was with him in Clinton, Kentucky at the time of the murder, but never stated that Boykin was with him.

- Everett told police there was a third person with he and McElrath, but did not name Boykin.

Boykin builds on these facts, and points to the following decisions by trial counsel to pursue a common defense to the detriment of Boykin:

- Trial Counsel should have attacked McElrath as either the shooter, or the getaway-car driver.

- When Fitts changed his testimony and identified Boykin after previously identifying McElrath, Fitts should have been impeached by trial counsel playing for the jury Fitts' taped statement to police identifying McElrath.

- Jonell DeBerry and Cornelius McElrath should have been called as witnesses to testify that Fitts told them he did not see who came around the corner of the house. This would have further impeached Fitts testimony identifying Boykin.

- Officer Perry should have been questioned regarding Fitts' first identification of McElrath.

- Every witness that identified McElrath as the shooter should have been pursued, including Wilson's five-year-old son, who did not testify at trial.

- Trial counsel should have provided an alibi for Boykin by calling his grandmother to testify that Boykin was with her at the time of the murder, and by calling McElrath to testify that Boykin was not with him.

- Trial counsel could have elicited testimony that neither McElrath or Everett told police that Boykin was with them at the time of the murder, despite the fact that they identified each other to police.

- Trial counsel should have moved to sever the trials of Boykin and McElrath, so that trial counsel could attack McElrath in defense of Boykin. Instead, trial counsel moved to sever on behalf of McElrath so that McElrath would not be prejudiced by

"guilt by association" with Boykin. According to Boykin, this is evidence of trial counsel's loyalty to McElrath at Boykin's expense.

• Trial counsel's decision to pursue a defense theory that Fitts was the shooter was inexplicable given that the pre-trial ballistics report showed that no gunshot residue was found on Fitts's hands. Yet trial counsel called as his only witness the author of the ballistics report who completely refuted the Fitts-as-shooter theory in front of the jury.

These facts fit squarely within the holding of this Circuit in *McFarland*. In *McFarland*, two women were tried for drug possession and other related charges when crack was found in a bedroom of the house where the two women lived. Trial counsel represented both women, and instead of pointing the finger at one woman or the other, attempted to convince the jury that neither woman possessed the drugs despite the obvious evidence that the room in which the drugs were found was one of the women's bedroom. This Court held that trial counsel could not call witnesses beneficial to one client, because they were detrimental to the other. In addition, trial counsel could not cross-examine his own clients to their own detriment in order to benefit his other client. Ultimately, this Court found that when trial counsel chose an inexplicable trial strategy (here, the Fitts-as-shooter theory), and forewent an obvious and strong defense (here, McElrath-as-shooter and Tennessee-alibi theory) to avoid inculpating a jointly represented co-defendant, an actual conflict of interest exists and the Sixth Amendment has been violated. *McFarland*, 356 F.3d at 709.

The same circumstances found in *McFarland* exist here. Trial counsel failed to call witnesses whose testimony would have called into question Fitts' identification of Boykin as a shooter, and trial counsel also failed to cross-examine McElrath in order to establish Boykin's alibi that he was in Tennessee at the time of the shooting. Trial counsel could not subject McElrath to cross-examination, and the impeachment of Fitts' identification of Boykin leaves McElrath as one of the shooters. This Court has held that the failure to call witnesses beneficial to client A but detrimental to client B, coupled with the failure to cross-examine client B, is the very definition of a conflict of interest, and a violation of the Sixth Amendment.

The Kentucky Court of Appeals disagreed with the above analysis and found that Boykin had not sufficiently shown an actual conflict of interest in order to meet the *Sullivan* requirements. However, we find that the Kentucky Court of Appeals' analysis is flawed. In deciding that no actual conflict existed, and holding that the "defenses and interests of Boykin and McElrath were not adverse or in conflict," the Kentucky court emphasized that there was "not a reasonable probability that an unconflicted defense attorney would have attempted to defend Boykin by seeking to identify McElrath as Everett's co-gunman." The Kentucky court hung its hat on the fact that two witnesses placed McElrath at a nearby house when the actual shots were fired. We respectfully disagree with the Kentucky court's conclusion. We find it obvious that Boykin's best defense was to point the finger at McElrath and Everett as he was never identified as being at the scene, and to establish an alibi that he was in Tennessee at the time of the murder. This weighing of the relative merits of the different choices available to trial counsel overlooks the fact that trial counsel decided against the best theory of defense for Boykin, and instead pursued a common-defense theory that failed to call witnesses favorable to Boykin and unfavorable to McElrath, and failed to cross-examine McElrath. If anything, this evidences the very conflicts the Supreme Court sought to weed out in *Holloway*, and later in *Sullivan*. Namely, trial counsel refrained from what was objectively Boykin's best defense in order to pursue a doomed mutual defense to protect McElrath. *See Holloway*, 435 U.S. at 490 ("in a case of joint representation of conflicting interests the evil – it bears repeating – is in what the advocate finds himself compelled to refrain from doing. . . .").

We find that not only has Boykin shown a Sixth Amendment violation, but he has also met his burden under AEDPA. We find that the Kentucky Court of Appeals' decision was an

unreasonable application of Federal law to the facts of this case. Under *Holloway* and *Sullivan*, Boykin has shown the requisite "actual conflict" that adversely affected his representation at trial. While the Kentucky court identified the correct Federal law to apply, it unreasonably applied that law to the facts of Boykin's case. Where, as here, the facts at trial show that a defendant's best defense is to point the finger at his co-defendant, it almost goes without saying that the two co-defendants cannot be represented by the same trial counsel. Permitting an attorney to labor under such a conflict of interest would inexorably have an adverse affect on the defense of at least one of the defendants, if not both. And such conflicts were exactly what the Supreme Court attempted to root out in *Holloway* and *Sullivan*.

Accordingly, we REVERSE the district court's denial of Boykin's petition for a writ of habeas corpus, and REMAND with instructions to grant the writ and to order the state to retry Boykin within 120 days or release him from custody.

3.      *Boykin's Claim of Ineffective Assistance of Appellate Counsel.*

The United States Supreme Court has long held that the Sixth Amendment guarantees the right to effective assistance of counsel on a first direct appeal as of right. *See Evitts v. Lucey*, 469 U.S. 387 (1985); *Smith v. Robbins*, 528 U.S. 259 (2000). Despite this long recognized right, the Kentucky Supreme Court has refused to acknowledge such a claim on collateral attack of a conviction. *Bowling v. Commonwealth*, 80 S.W.3d 405, 421 (Ky. 2002). The Kentucky Supreme Court only recognizes a claim of ineffective appellate counsel in two instances: (1) if a defendant's appeal is dismissed because of ineffective assistance of counsel, the defendant is entitled to reinstatement of the appeal; and, (2) if a defendant's conviction was not appealed due to the neglect of counsel, that defendant could, upon motion to the court that had jurisdiction to hear the appeal, obtain a belated appeal. *Hicks v. Commonwealth*, 825 S.W.2d 280 (Ky. 1992). This is in direct conflict with the United States Supreme Court's holding in *Evitts v. Lucey* and in *Smith v. Robbins*. *See Lofton v. Commonwealth*, 2004 WL 178388 ( Ky. Ct. App., Jan. 30, 2004) (recognizing and criticizing Kentucky Supreme Court's conflict with *Evitts v. Lucey* and *Smith v. Robbins*); *see also Payne v. Commonwealth*, 2004 WL 691208 (Ky. Ct. App., Apr. 2, 2004) (same).

The district court recognized this conflict. The lower court found that because a collateral attack is a civil matter and is "not part of the criminal proceeding itself," "states have no obligation to provide this avenue of relief." (quoting *Pennsylvania v. Finley*, 481 U.S. 551, 557 (1987)). According to the district court, the Kentucky Supreme Court has "simply opted to provide no avenue of relief of a recognized federal right." However, the district found that merely because Kentucky does not recognize the right to effective assistance of counsel on appeal does not render it non-cognizable by a federal court. *Id.* The district court went on to consider Boykin's claim of ineffective assistance of appellate counsel in the first instance. It found that just like at the trial level, because there was no actual conflict of interest there was no ineffective assistance of appellate counsel.

We find that the district court was correct in addressing the merits of Boykin's claim of ineffective appellate counsel even though the Kentucky Supreme Court refuses to recognize such a claim. However, the district court erred in denying Boykin's petition on the merits. The gist of Boykin's argument is that because the same attorney who labored under a conflict of interest at his trial controlled his subsequent appeal, Boykin was unable to raise on direct appeal the obvious conflict of interest at trial. The analysis in the previous section regarding the conflict of interest the attorney labored under applies here as well.

Not only was Boykin's Sixth Amendment right to effective assistance of counsel at trial violated, but it was also violated on appeal.

IV.

We hold that Boykin's Sixth Amendment right to effective assistance of counsel was violated at trial and on appeal due to the actual conflict of interest his attorney labored under. Accordingly, we REVERSE the district court's denial of Boykin's petition for a writ of habeas corpus, and REMAND with instructions to grant the writ and order the state to retry Boykin within 120 days or release him from custody.

_____

**DISSENT**

_____

ALICE M. BATCHELDER, Circuit Judge, dissenting.  If the facts regarding Boykin's counsel's performance were as the majority has stated, then I would likely concur.  But the record indicates that defense counsel did much more than the opinion suggests to vindicate his client and that some of the majority's conclusions about whether he represented conflicting interests are erroneous.  While I certainly believe that it is inadvisable for a criminal defense attorney to represent co-defendants at trial, because defense counsel in this case did not labor under an actual conflict of interest and did not provide constitutionally ineffective assistance, I respectfully dissent from parts III(2)(B) and (3) of the lead opinion.

Joint representation of co-defendants in a criminal trial "does not constitute per se ineffective assistance of counsel."  *Moss v. United States*, 323 F.3d 445, 455 (6th Cir. 2003).  As the majority points out, when a defendant does not object at trial to the joint representation, we presume prejudice only if the defendant demonstrates that his attorney actively represented competing interests. *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980).  We have stated that *Sullivan* requires a defendant in a joint representation case to establish both an "actual conflict" and an adverse "effect on representation" in order to be entitled to relief under the Sixth Amendment. *McFarland v. Yukins*, 356 F.3d 688, 705 (6th Cir. 2004).  To demonstrate an adverse effect on representation, the defendant must show that the conflict caused the attorney's choice that the defendant alleges was deficient.  *Id.* Additionally, "counsel's choice to forego a defense that would have been inconsistent with counsel's duty to another client is evidence of adverse effect only if it is clear that the choice was not part of a legitimate trial strategy, judged under the deferential review of counsel's performance prescribed in *Strickland*."  *Id.* at 706.

## I. Counsel's Performance at Trial

The majority lists several reasons why it believes Boykin established that his and McElrath's trial counsel had an actual conflict of interest and that he favored McElrath.  It states that defense counsel should have:  attacked McElrath as the shooter or getaway driver; attacked Fitts with his prior inconsistent statements; called rebuttal witnesses to attack Fitts's testimony; attacked Officer Perry's testimony; called certain witnesses to identify McElrath as the shooter; called Boykin's and McElrath's grandmother as an alibi witness; called McElrath and/or Everett to testify that Boykin did not participate in the crime; moved to sever the trial on behalf of Boykin; and discarded the "inexplicable" Fitts-as-shooter defense theory.  Majority opinion at pp. 6–7.  The majority relies on counsel's supposed failure to take the above actions to conclude that he was laboring under an actual conflict of interest and that Boykin is entitled to habeas relief.  I believe that conclusion is incorrect for several reasons.

First, we do not know whether McElrath or Everett would have testified favorably for Boykin.  Even if McElrath and Everett would have agreed to testify,[1] there is absolutely no evidence that they would have said that Boykin was not with them in Clinton, Kentucky, on the night of the shooting.  McElrath and Everett admitted to police that they were together the night of the murder. While it is true that neither McElrath nor Everett told police that Boykin was with them that night, they *never* told police that Boykin was *not* with them.  Second, the record does not contain any affidavits from McElrath, Everett, the grandmother, or the other witnesses the majority postulates would have testified favorably for Boykin.  Those witnesses who gave statements to police could

---

[1]As defendants in the trial, McElrath and Everett could not be compelled to testify.

have been lying and thus been unwilling to take the stand and give sworn testimony under penalty of perjury. Moreover, the witnesses may not have been competent to testify under the Kentucky Rules of Evidence, KRE 601.[2]

The decision to call or not call certain witnesses is exactly the type of strategic decision that the courts expect attorneys to make. *See United States v. Best*, 426 F.3d 937, 945 (7th Cir. 2005) ("[A] lawyer's decision to call or not to call a witness is a strategic decision generally not subject to review. The Constitution does not oblige counsel to present each and every witness that is suggested to him." (citations and internal quotations omitted)); *United States v. Luciano*, 158 F.3d 655, 660 (2d Cir. 1998) ("The decision not to call a particular witness is typically a question of trial strategy that appellate courts are ill-suited to second-guess."); *Blanco v. Singletary*, 943 F.2d 1477, 1495 (11th Cir. 1991) ("The decision as to which witnesses to call is an aspect of trial tactics that is normally entrusted to counsel."); *Tosh v. Lockhart*, 879 F.2d 412, 414 (8th Cir. 1989) ("[T]he decision not to use alibi testimony may reflect the reasonable exercise of judgment in view of the attorney's concern that the testimony would be conflicting . . . or otherwise unfavorable." (internal citations omitted)); *cf. Strickland v. Washington*, 466 U.S. 668, 689 (1984) ("[T]he defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" (citation omitted)). We are in no position to determine the reasonableness of counsel's decisions not to call these witnesses because we know not to what facts they would testify; we have merely a few unsworn statements to the police. Furthermore, we cannot say with any certainty that defense counsel failed to call these witnesses specifically because, even though they would have been beneficial to Boykin's defense, they would have been detrimental to McElrath's — both uncertain conclusions.[3] Counsel's decisions could very well have been part of a sound trial strategy and not evidence of a conflict of interest. *See McFarland*, 356 F.3d at 706.

Next, the majority mistakenly contends that defense counsel did not vigorously cross-examine Fitts or Officer Perry. The record is replete with instances where defense counsel submitted into evidence through cross-examination the very facts the majority claims he was deficient for not arguing. Specifically, counsel confronted Fitts about the following: whether Fitts told the police McElrath committed the shooting; whether Fitts could even identify the shooters because it was dark outside and the shooters were wearing scarves over their faces; and Fitts's failure to tell Officer Perry on the night of the crime that Boykin was one of the shooters. Additionally, defense counsel adequately explained that Fitts had changed his story.

Similarly, defense counsel extensively cross-examined Officer Perry and elicited the following testimony: only Fitts placed Boykin in Clinton, Kentucky, on the night of the shooting; nobody told police that the gun used in the shooting belonged to Boykin and no physical evidence connected Boykin to the gun; Fitts did not identify Boykin as a shooter until three or four days after the shooting; Fitts needed to pick Boykin out of a lineup to identify him, even though he knew Boykin personally; and, Perry did not remember asking McElrath during questioning whether Boykin was with McElrath in Clinton, Kentucky, the night of the shooting.

The majority opinion also stretches other facts. For example, it states that police found the murder weapon "at McElrath's (and Boykin's) grandmother's house," but fails to mention that Boykin lived at that house[4] and the police found the weapon in his bedroom closet. Moreover, the

---

[2] This would have been a particularly relevant consideration when deciding whether to put Wilson's five-year-old son on the stand.

[3] For example, it is not at all detrimental to McElrath for his and Boykin's grandmother to testify that Boykin was at home in Tennessee the night of the murder.

[4] McElrath lived at a different residence.

majority opinion flatly states that Boykin's ballistics expert testified that Fitts could not have been the shooter, but the trial transcript reveals that the expert testified that she could neither say that Fitts had fired a weapon or that he had not. And the majority's pointing out that defense counsel failed to call to the stand "every witness that identified McElrath as the shooter," is somewhat misleading — only Fitts and Wilson's five-year-old son identified McElrath, and Fitts did testify, albeit for the prosecution.[5]

Most importantly, the majority opinion fails to articulate adequately why any of defense counsel's other actions or inactions demonstrate an actual conflict of interest. That is, the majority opinion simply concludes that counsel's trial strategy benefitted McElrath to the detriment of Boykin. And its determination that Boykin's best defense would be to paint McElrath as the shooter misses the mark. Boykin's best defense was to contend that he was not in Clinton, Kentucky, on the night of the murder, and defense counsel presented that defense through his cross-examinations of Fitts and Officer Perry. We are required to evaluate counsel's performance without the distorting effects of hindsight. *See Strickland*, 466 U.S. at 689. Defense counsel's method of introducing evidence favorable to Boykin may not meet the majority's subjective standard of performance, but it certainly does not support the conclusion that there was an actual conflict of interest. McElrath did not dispute that he was in the area at the time of the shooting; Eric and Sammy Hunter testified that McElrath unexpectedly visited their parents' house down the street from the shooting and that he left immediately after the shooting. Pointing to McElrath as the shooter would not necessarily benefit Boykin — as long as Boykin was not the shooter it does not matter if McElrath (or Everett) was. The propositions that McElrath did not kill Wilson and that Boykin did not kill Wilson are not mutually exclusive.

Finally, the majority incorrectly compares this case to *McFarland*. Majority opinion at p. 7. In that case, the defense attorney representing co-defendants Reeves and McFarland indicated to the court on the day of the trial that he might have to raise antagonistic defenses and, upon questioning by the court, both of the co-defendants explicitly stated that they believed they should have separate attorneys. *McFarland*, 356 F.3d at 693-94. Instead of allowing the defendants to get new attorneys, however, the trial court severed the cases and a different judge tried each one. *Id.* at 694. What distinguishes *McFarland* from the case at bar is that the defendants in *McFarland* had obviously antagonistic defenses — the police found drugs in Reeves's bedroom, but counsel refused to utilize that fact to exculpate the McFarland — and the attorney made ambiguous statements about certain events, appearing to inculpate McFarland even though the evidence inculpated Reeves. *Id.* at 705, 708-09. The main issue in *McFarland* was whether each defendant possessed the drugs, an element the prosecution struggled to prove. It was clear that McFarland, who did not live in the bedroom in which the police found the drugs and who was not named by witnesses as selling drugs, could have simply asserted that Reeves possessed the drugs, but the attorney did not advance that defense because of his duty of loyalty to Reeves.

The majority contends that *McFarland* is factually on point because defense counsel here advanced an inexplicable theory (here the Fitts-as-shooter theory; in *McFarland* the theory that neither of the defendants possessed the drugs but that the two male occupants of the house did) instead of an obviously strong defense (here the McElrath-as-shooter and Boykin-in-Tennessee theory; in *McFarland* that only Reeves had possession of the drugs). But *McFarland* is inapposite to the instant case because the majority's proposed defense strategy (McElrath as the shooter) is not obviously beneficial to Boykin. Boykin could not exculpate himself simply by pointing to McElrath as the shooter because: (1) there were two shooters — theoretically both Boykin and McElrath

---

[5]It is probable that Fitts's initial statement to the police officer Morrison that "Treon done it" was a conclusion stemming from Fitts's having seen McElrath drive by the house earlier, and not truly an identification of McElrath as one of the actual shooters. Nevertheless, defense counsel solicited from Officer Morrison the testimony about Fitts's initial, conflicting statement.

could have been shooters, while in *McFarland* only Reeves lived in the bedroom in which the police found the drugs and witnesses identified only Reeves as being involved with the drugs; and (2) the Hunters' testimony places McElrath down the street at the time of the crime, so labeling him as the shooter would have forced defense counsel to attack the Hunters. In response to the fact of the Hunters' testimonies, Boykin contends that his attorney should have at least advanced the position that McElrath was the getaway driver. But again, that defense gets Boykin nowhere; he could have been a shooter and McElrath could have been the getaway driver. The Fitts-as-shooter joint defense theory may not have been wise given the evidence, but it certainly was not antagonistic to Boykin's interests.

Thus, we are left to decide whether defense counsel's seeking severance of the trial on behalf of McElrath but failing to seek a severance on behalf of Boykin establishes an actual conflict of interest. Defense counsel filed the motion to sever on behalf of McElrath because McElrath was charged only with complicity in the crime.[6] Perhaps defense counsel should have filed motions to sever on behalf of both Boykin and McElrath, but the failure to do so alone does not demonstrate a conflict of interest. Once the court denied the motion to sever, it was reasonable to assume that it would also deny a similar motion on behalf of Boykin.

Because Boykin's defense attorney did not labor under an actual conflict of interest, Boykin cannot meet the *Sullivan* Standard. Consequently, Boykin must prove the traditional *Strickland* elements: (1) that his attorney's performance was constitutionally deficient; and (2) that the attorney's deficient performance prejudiced Boykin. *Strickland*, 466 U.S. at 687. Boykin has not satisfactorily established either prong of the *Strickland* standard. Therefore, I would hold that Boykin's attorney did not provide ineffective assistance of counsel at the trial.

## II. COUNSEL'S PERFORMANCE ON DIRECT APPEAL

The majority relies upon the same facts and analysis that led to its conclusion that counsel had an actual conflict of interest at trial to determine that counsel had an actual conflict of interest on direct appeal as well. Based on the analysis in the preceding section, I disagree with the majority's conclusion.

## CONCLUSION

Respectfully, I cannot concur in the majority's holding that Boykin's attorney labored under an actual conflict of interest and therefore provided ineffective assistance of counsel. Therefore, I would **AFFIRM** the district court's denial of Boykin's petition for a writ of habeas corpus.

---

[6]The motion reads:

Comes the Defendant, TREON McELRATH, and moves this Court, pursuant to CR 9.16, to grant said Defendant a separate trial from the other Defendants in that Treon McElrath is only charged with complicity and to do otherwise he may be found guilty by association, therefore would be prejudiced by trial with the Defendants charged with murder.