NOT RECOMMENDED FOR PUBLICATION
File Name:  15a0032n.06

No. 14-3418

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

SCOTT BLAZER,                                    )
                                                 )
        Petitioner-Appellant,                    )
                                                 )
                                                 )
            v.                                   )       ON    APPEAL    FROM    THE
                                                 )       UNITED   STATES   DISTRICT
                                                 )       COURT FOR THE NORTHERN
KIMBERLY CLIPPER, Warden,                        )       DISTRICT OF OHIO
                                                 )
        Respondent-Appellee.                     )
                                                 )
                                                 )

FILED
Jan 12, 2015
DEBORAH S. HUNT, Clerk

BEFORE:  SILER, GRIFFIN, and WHITE, Circuit Judges.

GRIFFIN, Circuit Judge.

Petitioner Scott Blazer appeals the district court's denial of his petition for a writ of

habeas corpus under 28 U.S.C. § 2254.  The sole issue before this court is whether the exclusion

at trial of an answering machine recording had a "substantial and injurious effect or influence"

on the jury's verdict.  Following our review of the record, we hold that the evidentiary error was

harmless.  We therefore affirm the judgment of the district court.

I.

The Ohio Court of Appeals described the relevant facts as follows:

In 2009, Blazer was charged with four counts of rape, two counts of kidnapping,
and one count of gross sexual imposition in the sexual assault of his brother's
step-daughter, "T.L."

The matter proceeded to a trial by jury, at which the following evidence was presented.

T.L. knew Blazer because her mother was married to his brother and she considered Blazer her uncle. Life at home was rough for T.L. because her mother and step-father did not get along, so T.L. began spending more time with her 42-year-old uncle. In November 2006, 13-year-old T.L. spent the night at Blazer's house and stayed up late using the computer. The next morning, the state alleged that Blazer climbed into the bed T.L. was sleeping in and performed oral sex on her. After this incident, T.L. continued her friendship with Blazer and, at one point, Blazer gave her a diamond "promise" ring. Blazer told T.L. that it meant that he would keep everything she told him and everything that happened between them a secret.

On January 26, 2008, T.L. went to Blazer's house for a family dinner. After everyone left, Blazer and T.L. began making vodka drinks. T.L., who was now 15 years old, testified she consumed at least a quarter of the bottle of vodka. She was also smoking and she played on the computer while her uncle sat on a futon and listened to music. After a while, T.L. felt sick, ran to the bathroom, and vomited. Blazer followed her and helped her clean up her vomit, which was all over the bathroom. She called a friend and told him that she had been drinking and got sick. The friend recommended she eat some bread. At the time, T.L. was wearing a shirt, underwear, boxer shorts over her underwear, and baggy sweat pants.

T.L. testified that the next thing she remembered was waking up in Blazer's bed, with Blazer talking about "finishing." Her uncle was naked and T.L. realized she did not have any bottoms on, her bra was unhooked, and her shirt was pushed up. T.L. testified that Blazer was on top of her and had his penis inside of her. She told the jury she was scared and asked Blazer "what are you doing" and "what time is it." T.L. stated that after Blazer was "finished," he gave T.L. the boxer shorts she had been wearing. T.L. testified she was still drunk and tired so she fell back asleep. At some point, she received a phone call from a friend and fell back asleep. Blazer woke her up around 8:30 a.m., telling her breakfast was ready. T.L. testified she got dressed and went into the kitchen, where Blazer was sitting with his girlfriend, who had just arrived. At one point, Blazer told T.L. he was "sorry," but she just ignored him.

When T.L. got home the next day, she threw her underwear and boxers in her trash can and showered. T.L. called a friend to tell her what happened, and also tried to call Blazer. A few days later, the police came to her house to investigate the incident after her friend's mother reported what had happened to the police. T.L.'s mother came home, and T.L. told her what happened. T.L.'s mother retrieved T.L.'s underclothes from the trash can and turned them over to the police. The Ohio Bureau of Criminal Investigation tested the underclothes, and

the results showed that Blazer could not be excluded as a minor source of the DNA found on the boxer shorts.

During cross-examination of T.L., defense counsel asked T.L. if she ever left a provocative message on Blazer's answering machine [in February 2009]. T.L. stated she had not. Counsel sought permission from the court to play a tape recording, which was allegedly a message T.L. left on Blazer's answering machine. The state objected, claiming they had not been provided the tape recording during discovery. The trial court recessed the jury to discuss the recording. On the recording, a girl is heard saying: "Hey, Scott, um, could you call me back? I kind of miss you. I miss your big long d*** in me. So hot. Anyways, just call me back. All right. Bye, baby."

The trial court excluded the recording from evidence finding that 1) it was error for the defense to fail to turn the tape over during discovery and 2) the tape had not been properly authenticated.

At the close of the state's case, the trial court dismissed one rape count pursuant to Blazer's Crim. R. 29 motion for acquittal.

Blazer testified in his own defense. He denied the 2006 incident ever happened. As to the January 28, 2008, incident, he testified that he had fallen asleep and woke up when he realized someone was in his bed. He testified that "someone" began kissing him and fondling him, but he did not know who it was. He stated he had sexual intercourse with the unknown person. He testified that he did not know who he was having sex with, but it was not uncommon for him to have sex with his girlfriend in the middle of the night. He further testified that he did not know if it was his girlfriend he was having sex with because he had been drinking. Finally, Blazer testified that he became aware he had sexual intercourse with T.L. after he was called for a family meeting. He admitted he knew that something had happened between him and T.L. but he did not know "how far it went."

The jury convicted Blazer of one count of rape, pursuant to [Ohio Revised Code § 2907.02(A)(1)(c)], which requires proof that the other party's "ability to resist or consent is substantially impaired," and acquitted him on all other charges. The trial court sentenced Blazer to nine years in prison.

*State v. Blazer*, No. 93980, 2010 WL 5487145, at *1−2 (Ohio Ct. App. Dec. 23, 2010) (footnotes omitted). On direct appeal, Blazer challenged the trial court's exclusion of the recording. The Ohio Court of Appeals held that the trial court erred in excluding the recording but concluded that any error was harmless:

Since we have found that the trial court erred in excluding the tape from evidence, we must next consider whether that error was harmless or if it affected Blazer's substantial rights.

Crim. R. 52(A) provides that "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded."

Blazer was convicted of rape under R.C. 2907.02(A)(1)(c), which states: "No person shall engage in sexual conduct with another * * * when * * * [t]he other person's ability to resist or consent is substantially impaired because of a mental or physical condition * * * and the offender knows or has reasonable cause to believe that the other person's ability to resist or consent is substantially impaired * * *."

The Ohio Supreme Court has held that substantial impairment must be established by demonstrating a present reduction, diminution, or decrease in the victim's ability, either to appraise the nature of his conduct or to control his conduct. *State v. Zeh* (1987), 31 Ohio St. 3d 99, 103–104, 509 N.E.2d 414. Substantial impairment need not be proven by expert medical testimony; it may be proven by the testimony of persons who have had some interaction with the victim and by permitting the trier of fact to obtain its own assessment of the victim's ability to either appraise or control her conduct. *Id.* Furthermore, voluntary intoxication is a "mental or physical condition" that could cause substantial impairment under R.C. 2907.02(A)(1)(c). *In re King*, Cuyahoga App. Nos. 79830 and 79755, 2002-Ohio-2313.

Blazer maintains that the taped message is clearly inconsistent with T.L.'s allegation that she was so impaired that she was incapable of resisting or consenting to sex with Blazer. But consent is not an element of rape under R.C. 2907.02(A)(1)(c). In other words, whether T.L. consented to sexual intercourse with Blazer is not relevant to a finding of rape under R.C. 2907.02(A)(1)(c). All the state was required to show was that T.L.'s *ability* to resist or consent was impaired and the defendant knew or had reasonable cause to believe that her *ability* to resist or consent was substantially impaired. (Emphasis added.)

T.L., who was 15 at the time of the rape, testified that she and Blazer made drinks, and she drank a quarter bottle of vodka. She stated that after vomiting, she called a friend before falling asleep. After the assault, T.L. called a friend and then fell back to sleep until Blazer later woke her. Blazer admitted T.L. was intoxicated, he acknowledged helping clean up her vomit, and he admitted he had sexual intercourse with her. Although he denied he personally gave her anything to drink, he admitted he knew she was intoxicated.

Based on the evidence presented at trial and because the tape recording was not relevant to a finding of guilt under R.C. 2907.02(A)(1)(c), we conclude any error

-4-

> in excluding the tape did not affect Blazer's substantial rights and was therefore harmless. We do note that had Blazer been convicted of rape or gross sexual imposition where an element of the crime was "force or threat of force," our analysis and conclusion based on this harmless error analysis would have been different.

*Id.* at *6 (alterations in original) (footnote omitted).

Blazer then filed a motion for reconsideration, arguing that the court of appeals applied the wrong harmless error standard. The court denied the motion for reconsideration. The Ohio Supreme Court denied Blazer's application for review. Blazer then filed a timely pro se petition for a writ of habeas corpus under 28 U.S.C. § 2254, raising four grounds for relief. After appointing counsel, the district court granted leave to amend to include a fifth claim:

> Petitioner's right to due process of law, as protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution, was violated by the application of a harmless error standard that did not consider the probable impact of the excluded evidence upon the jury, which resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States.

A magistrate judge issued a Report and Recommendation advising the district court to deny Blazer's petition because the first four grounds were procedurally defaulted and the fifth claim lacked merit. The district court adopted the Report and Recommendation over Blazer's objection and denied the petition. Nevertheless, the district court granted a certificate of appealability on Blazer's fifth claim.

## II.

We review de novo the district court's legal conclusions and rulings on mixed questions of law and fact. *Jalowiec v. Bradshaw*, 657 F.3d 293, 301 (6th Cir. 2011). Under the Antiterrorism and Death Penalty Act of 1996 ("AEDPA"), federal courts may not grant habeas relief on any claim that was adjudicated on the merits in the state courts unless the adjudication

resulted in a decision that (1) was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court; or (2) was based on an unreasonable determination of the facts in light of the evidence presented to the state courts. *Id.* (citing 28 U.S.C. § 2254(d)). Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court on materially indistinguishable facts. *Boykin v. Webb*, 541 F.3d 638, 642 (6th Cir. 2008). Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct legal principle but unreasonably applies it to the facts of the petitioner's case. *Id.* "[T]o warrant habeas relief, the application must be found to be 'objectively unreasonable.'" *Jalowiec*, 657 F.3d at 301 (quoting *Williams v. Taylor*, 529 U.S. 362, 409 (2000)). "AEDPA thus imposes a highly deferential standard for evaluating state-court rulings." *Id.* (internal quotation marks omitted).

Since the Supreme Court's landmark decision in *Chapman v. California*, 386 U.S. 18 (1967), in which the Court "adopted the general rule that a constitutional error does not automatically require reversal of a conviction, the Court has applied harmless-error analysis to a wide range of errors and has recognized that most constitutional errors can be harmless." *Arizona v. Fulminante*, 499 U.S. 279, 306 (1991). On direct review of constitutional errors, the government has the burden of proving that the error was "harmless beyond a reasonable doubt." *Chapman*, 386 U.S. at 24. On collateral review, however, "[c]iting concerns about finality, comity, and federalism," the Supreme Court has "rejected the *Chapman* standard in favor of the more forgiving standard of review applied to nonconstitutional errors on direct appeal from federal convictions." *Fry v. Pliler*, 551 U.S. 112, 116 (2007). We may only grant a writ if the

error resulted in "actual prejudice." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (internal quotation marks omitted).

In determining whether the petitioner was actually prejudiced, courts ask whether the error had a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). This is the standard for reviewing all non-structural errors on collateral review; it applies "whether or not the state appellate courts recognized the error." *Ruelas v. Wolfenbarger*, 580 F.3d 403, 411 (6th Cir. 2009) (internal quotation marks omitted). The *Brecht* standard continues to apply after passage of the AEDPA. *Id.* (citing *Fry*, 551 U.S. at 119−20). "[T]he determination of whether an error had a substantially injurious effect on the jury's verdict is broader and thus subsumes the question whether the state court reasonably applied *Chapman*." *Id.* at 412 (internal quotation marks omitted). To satisfy the *Brecht* standard, there must be "more than a reasonable possibility that the error contributed to the jury's verdict. If . . . there is a reasonable *probability* that a trial error affected or influenced the verdict, then the *Brecht* standard would be satisfied." *Mitzel v. Tate*, 267 F.3d 524, 534 (6th Cir. 2001) (internal quotation marks and citation omitted).

Blazer argues that the answering machine recording would have made it more likely that the jury would have accepted his version of events for two reasons: (1) "the provocative nature of the message evinced both an awareness of the act and an appreciation for it that is wholly inconsistent with a claim that T.L. was too intoxicated, and substantially impaired, to be aware of what was happening," and (2) "the tape had substantial impeachment value." In light of the record as a whole, we cannot agree there is a reasonable probability that exclusion of the recording affected the verdict.

As a preliminary matter, the jury convicted Blazer of a rape of "substantial impairment," not rape by threat or force. The sole elements of the offense are that (1) two people who are not spouses living together engaged in sexual conduct, (2) one person's ability to resist or consent was substantially impaired because of a mental or physical condition, and (3) the offender knew or had reasonable cause to believe that the other person's ability to resist or consent was substantially impaired. Ohio Rev. Code § 2907.02(A)(1)(c). The Ohio Court of Appeals found that "Blazer admitted T.L. was intoxicated, he acknowledged helping clean up her vomit, and he admitted he had sexual intercourse with her. Although he denied he personally gave her anything to drink, he admitted he knew she was intoxicated." *Blazer*, 2010 WL 5487145, at *6. Blazer does not challenge those factual findings on habeas review. Rather, Blazer contends that the recording evinces an "awareness" of what occurred, thereby undermining that T.L. was substantially impaired. Blazer's argument is unpersuasive for multiple reasons. First, the contents of the recording do not address whether T.L.'s ability to resist or consent was substantially impaired at the time of the offense. A general "awareness" of events one year after the offense does not disprove that T.L. was substantially impaired at the time of the offense. Moreover, the recording is not actually inconsistent with T.L.'s testimony about her degree of awareness: she testified that when she awoke she realized Blazer was on top of her and his penis was inside of her. She never testified that she was unaware that such sexual activity occurred. Second, consent—which can hardly be inferred from a message left one year later—is not an element of the offense. The state court recognized as much, stating that its harmless-error analysis would have been different "had Blazer been convicted of rape or gross sexual imposition where an element of the crime was 'force or threat of force.'" *Id.* However, as the state court observed, "[a]ll the state was required to show was that T.L.'s *ability* to resist or

consent was impaired and the defendant knew or had reasonable cause to believe that her *ability* to resist or consent was substantially impaired." *Id.* Accordingly, we cannot agree with Blazer that the message evinces an "awareness" that undermines T.L.'s impairment at the time of the offense.

Blazer also argues that the recording had "substantial impeachment value." His argument goes to T.L.'s general credibility. At trial, defense counsel asked T.L. whether she left "a provocative telephone message" on Blazer's answering machine earlier that year. She said "no." Blazer argues that the message would have undermined T.L.'s credibility because the jury's "view of her credibility would have been further diminished had they not only known of the contents of the message, but heard her lie about it."

In light of the entire state court record, it is not reasonably probable that the excluded evidence would have affected the jury's verdict. First, Blazer's argument is highly tenuous. He relies on the possibility that the jury would have believed that T.L. left the message and that her denial of having left the message would have caused the jury to disbelieve her testimony about the degree of her impairment. However, Blazer does not contest the state court's factual findings that T.L. had been drinking vodka to the point of vomiting, which Blazer witnessed. Nor does Blazer contest the state court's finding that he was aware of her intoxication. Second, T.L. was subjected to extensive cross-examination on facts decidedly more relevant to the elements of the offense. She was questioned, for example, about the telephone calls she made and received during the course of the night. These questions tested the veracity of her testimony about the course of events before and after the sexual conduct. She was also questioned about the nature of her relationship with Blazer, such as whether she was "affectionate" toward Blazer during a family vacation, and the fact that she continued to contact and spend time with Blazer, even after

an alleged non-consensual sexual contact in 2006. These questions tested her credibility with respect to her denial that she had feelings for Blazer or otherwise sought sexual contact. Third, other testimony supported that Blazer had cultivated an unusually close relationship with T.L., including reading her a poem he wrote about her "chest" when she was 12 or 13 years old and buying her a "promise" ring to signify that he would keep her secrets. This evidence supported T.L.'s version of events and would not have been undermined by the answering machine recording.

III.

For these reasons, we affirm the judgment of the district court.